(No. 34550.—

THE PEOPLE OF THE STATE OF ILLINOIS, Defendant in Error, *vs.* SAMUEL GLENN PERRONI, Plaintiff in Error.

*Opinion filed September 18, 1958.*

582

DANIEL W. HANDLIN, of Lincoln, for plaintiff in error.

LATHAM CASTLE, Attorney General, of Springfield, and DARRELL E. KLINK, State's Attorney, of Lincoln, (FRED G. LEACH, and WILLIAM H. SOUTH, of counsel,) for the People.

Mr. JUSTICE DAVIS delivered the opinion of the court:

The defendant, Samuel Glenn Perroni, was indicted in the circuit court of Logan County for the crimes of burglary and larceny. The first count of the indictment charged burglary, the second, burglary and larceny, and the third, larceny. All counts related to the same transaction. Motions to quash the indictment and to suppress certain evidence were heard and overruled, and the case proceeded to trial. At the close of the People's case and after all evidence had been heard, motions by defendant for a directed verdict were denied, and the jury found the defendant guilty as charged. Post-trial motions were denied and the defendant was sentenced to serve a term of not less than three nor more than five years in the penitentiary.

A writ of error was prosecuted by defendant to reverse his conviction. He contends that the trial court erred in denying the pretrial motions to quash and suppress, and that the evidence did not establish his guilt beyond a reasonable doubt, in view of the testimony of certain witnesses offered to establish an alibi. These contentions require a review of the evidence heard on the motion to suppress and at the trial.

On Saturday, September 15, 1956, Frank Krotz and Edward W. Krotz, copartners, operated a retail food market in the city of Lincoln, known as Frank's Food Fair, and issued Eagle trading stamps to their customers which were redeemable for cash or merchandise. The office was in part of the front of the building and was separated from the market by a partition. A safe, equipped with rollers and weighing about 500 pounds, was located in the office. It was used for the storage of money and valuable

papers. The market operated on a self-service basis and employed stock clerks and check-out personnel, who were under the supervision of the partners.

Three employees of the market testified that they saw a man, later identified as the defendant, in or near the store during the afternoon of September 15, 1956. Duane Kretzinger, a clerk, testified that he saw and talked with defendant in the rear of the market. James Forrester, a clerk, identified the defendant as the man who conversed with him in front of the market as he was returning from carrying out merchandise. He testified that defendant asked what time the store closed that night and whether it would be open on Sunday; that he answered that it closed at 9:00 P.M. and would be closed all day on Sunday; and that defendant replied that he and his wife were new in town and they wanted to know just in case they needed something. Bonnie Powell, head checker at the store, testified that at about 2:00 P.M. on the same day she saw defendant pace back and forth in front of the store and look into the office each time he passed. All of these witnesses stated that the man they saw was over six feet tall, weighed about 190 pounds, and those who talked with him testified that he spoke with a slight accent. This description accurately identified the defendant. It is undisputed that at the time in question defendant was living with his wife and family in a trailer located at the north edge of the city of Springfield, about 30 miles south of Lincoln.

About 9:30 P.M. on Saturday, September 15, 1956, Edward W. Krotz closed the store after placing about $1,300 in cash and $800 worth of Eagle stamps in the safe, which already contained about $100 in silver. The stamps were principally unissued, although there were a few books of redeemed stamps. The combination on the safe was then set and the doors securely locked.

At 9:30 A.M. on Sunday, September 16, Krotz returned to the store and found that the double metal doors at the rear of the store had been forced and the lock broken. Blue-green marks which appeared on the doors were apparently made by the tool used to force them open. At the front of the store and just outside of the office, he found the safe, with its door torn off, lying on its back and its contents removed. Krotz notified the police and the local representative of the Eagle Stamp Company who in turn dispatched letters to all local accounts advising them of the serial numbers of the stamps known to have been taken. In response to a request made by the local chief of police, Maurice Evans, an employee of the State Bureau of Criminal Identification and Investigation, came to the market about noon of the same day.

Evans spent the balance of the day photographing the safe and premises and dusting for fingerprints. He found that the safe contained many marks left by the tools used to break it open and that one mark in particular was made by a tool having a burr which measured about 3/32nds of an inch. He used a fingerprint camera to photograph the portions of the safe where such mark appeared. The camera greatly enlarged this identifying mark. At the trial he testified that it was his opinion that the mark in question had been made by a crowbar with a matching burr which was found in the trailer occupied by defendant and his wife.

On Monday, September 17, 1956, an employee of Castor's Super Market in the city of Springfield saw a man in the store, who was later identified as the defendant, pick up 8 or 10 empty Eagle stamp books. He reported the occurrence to the manager who directed him to obtain the license number of the car which the man was driving. The employee and a co-worker observed this man drive away in a 1948 Chevrolet station wagon bearing Nevada license

number W-2775. On the following day, an unidentified woman came into Castor's market and cashed a book of Eagle stamps. In so doing, she gave a name and address which was recorded. Investigation disclosed that this name and address were fictitious. The woman was seen leaving the parking lot in the same 1948 Chevrolet station wagon, observed the previous day, which, according to the testimony of one of the supermarket employees, was driven by the defendant. On the morning of September 19, defendant again entered Castor's Super Market and presented three books of Eagle stamps to be cashed. He was referred to the manager who denied the request because of the fictitious address which had been given by the woman the prior day. Defendant left and was seen driving away in the same car. These occurrences were reported to the Sangamon County authorities. Eugene Burke, a local representative of the Eagle Stamp Company, testified that 90 per cent of the stamps in the book redeemed from the woman at Castor's, had been issued to Frank's Food Fair in Lincoln and the balance to other accounts in that city.

On the morning of September 26, 1956, Paul W. Terril, chief investigator for the sheriff of Sangamon County, visited a trailer court on the north edge of the city of Springfield where he found a station wagon with Nevada license W-2775 parked outside one of the trailer residences. He was admitted to the trailer by Virginia Perroni, wife of the defendant, advised defendant that he was wanted for questioning, and they left the premises together in Terril's car. The defendant was taken to the county jail where he was fingerprinted and held.

The same afternoon Terril returned to the trailer accompanied by Edward W. Krotz, and the chief and assistant chief of police of Lincoln, who were in uniform. Terril introduced them to Mrs. Perroni and requested permission to search the station wagon. According to the witnesses for the People, she told them that the car be-

longed to her husband and that she had no objection to the search. However, nothing pertinent was found. The men then returned to the trailer and asked Mrs. Perroni if they might come in and look around. She invited them to enter, and offered them coffee, which they refused. The chief of police asked her if she had any stamp books and requested that she open certain drawers in a cabinet. Mrs. Perroni complied, and produced a number of empty stamp books bearing an identification of Castor's market. The chief of police asked if they might look in a certain closet. Mrs. Perroni opened the closet door and pushed back the items of clothing it contained. As she did so, Krotz reached into the bottom of the closet and picked up a blue-green crowbar, a chisel and a sledge. Mrs. Perroni stated that these were plumbing tools used by her husband. The chief of police then asked whether they could take the tools with them if they would give her a receipt. Mrs. Perroni assented and a receipt was given. She asked Terril whether she had to let these men go through her house. He told her that she could refuse unless they had a search warrant. Mrs. Perroni then stated she preferred that they look no further and the officers left, taking the tools with them. All three items were admitted in evidence at the trial over defendant's objection. Photographs were taken of the station wagon from which various witnesses at the trial identified the car driven by the defendant on his visits to Castor's market.

Late in the afternoon of September 26, the defendant was questioned by William Abernathie and Thomas Howerton, employees of the State Bureau of Criminal Identification and Investigation. According to their testimony, the defendant at first related that he had bought the books of stamps from a stranger at the Rex Club where he worked, but later during this interrogation, he repudiated this story and stated that he knew nothing about any stamp books. He was also questioned about tools and denied owning any.

He was then shown the tools in question and advised that they had been taken from his trailer, whereupon he stated that he had never seen them before; and that if the officers took them from the trailer, they must have put them there.

The defendant did not testify in his own behalf but offered the statements of four witnesses to establish an alibi. His wife testified that at the time in question defendant was employed at a dinner club in the city of Springfield, known as the Rex Club; that he left for his place of employment at about 9:30 P.M. every evening and returned at about 5:30 A.M.; and that on the afternoon of September 15, she and her husband took their children to a movie in the city of Springfield, according to their Saturday afternoon custom. The owner of the Rex Club testified that defendant had worked for him from about August 1, 1956, to September 16, at which time he was discharged because he was no longer needed. The owner and two other employees also testified that defendant came to work at the club between 9 and 10 P.M. on September 15, and that he was there until it closed at about 4 A.M. on Sunday the 16th. It further appears that during the month of September, 1956, the city of Lincoln observed daylight saving time, while Springfield operated on standard time, so that it would have been 5 A.M. in Lincoln when the defendant left his place of employment.

Defendant first contends that the indictment should have been quashed because it did not contain a sufficiently clear and concise statement of the charge to enable him to prepare his defense. Section 36 of division I of the Criminal Code defining the offense of burglary provides: "Whoever willfully and maliciously and forcibly breaks and enters, or willfully and maliciously, without force (the doors or windows being open), enters into any dwelling house, * * * shop, store-house, * * * or other building, with intent to commit murder, robbery, * * * or other felony or larceny, shall be deemed guilty of burglary * * *." (Ill.

Rev. Stat. 1955, chap. 38, par. 84.) Section 6 of division XI of the Criminal Code states: "Every indictment or accusation of the grand jury shall be deemed sufficiently technical and correct which states the offense in the terms and language of the statutes creating the offense, or so plainly that the nature of the offense may be easily understood by the jury." (Ill. Rev. Stat. 1955, chap. 38, par. 716; also see: *People* v. *Duden,* 3 Ill.2d 16; *People* v. *Levin,* 412 Ill. 11.) Count I of the indictment charged that the defendant on the 16th day of September, 1956, "feloniously, wilfully, maliciously and forcibly did break and enter a certain store building, known as Frank's Food Fair, situate at 300 North McLean Street in the City of Lincoln, in the County of Logan and State of Illinois, of, owned by and in the possession of Frank Krotz and Edward W. Krotz, co-partners doing business under the name and style of Frank's Food Fair, there situate, with intent the personal goods, chattels, money and property of said Frank Krotz and Edward W. Krotz, co-partners doing business under the name and style of Frank's Food Fair, in the said store building, to-wit: a grocery store and meat market, then and there being, then and there feloniously, wilfully and maliciously to steal, take and carry away." This is a verbose, yet clear, statement of the offense of burglary in the terms and language of the statute. It is sufficiently specific to enable the defendant to properly prepare his defense, and to cause the jury to understand the offense. Counts II and III were patterned, *mutatis mutandis,* after count I. We conclude that the motion to quash the indictment was properly overruled.

Defendant made a timely motion to suppress the crowbar, chisel and sledge, which the court denied after a full hearing, and these items were subsequently admitted in evidence over defendant's objection. There is but little variance in the testimony of Mrs. Perroni and the officers concerning the circumstances surrounding the search and

taking of these tools. When all the evidence is considered, the conclusion is inescapable that the search was made and the tools were taken with the consent of Mrs. Perroni. Defendant urges, however, that even though his wife consented to the taking of these tools, he was not bound thereby and that such taking without a search warrant constituted an unlawful search and seizure in violation of his constitutional rights, rendering the evidence inadmissible. In support of his position he relies upon *People* v. *Lind,* 370 Ill. 131. The People contend that the permission of Mrs. Perroni to search the trailer, jointly owned by her and the defendant, rendered the search and seizure lawful, since she was not acting or pretending to act as the defendant's agent, and cite *People* v. *Shambley,* 4 Ill.2d 38. In *Shambley,* we examined the decisions in *Lind* and in *Amos* v. *United States,* 255 U.S. 313, 65 L. ed. 654, which held under the particular circumstances involved that the wife's consent could not waive the husband's rights. We observed that those decisions, which involved elements of implied coercion, failed to consider the effect of joint ownership of the premises searched. After reference to State and Federal decisions, we stated that "the rule seems to be well established that where two persons have equal rights to the use or occupation of premises, either may give consent to a search and the evidence thus disclosed can be used against either." (*People* v. *Shambley,* 4 Ill.2d 38, 42.) In the case at bar, as in *Shambley,* the premises searched were jointly owned by husband and wife who had equal rights to its use and occupation. In both instances consent to the search was freely given by the wife. We conclude that the consent given by Mrs. Perroni rendered the search and ultimate seizure lawful and that the articles seized, being otherwise relevant and material, were properly admitted in evidence against the defendant.

The denial of the motion to suppress may also be sustained on the ground that the defendant failed to claim

ownership of the articles seized or demand their return. The motion to suppress neither alleged that the tools seized were the property of the defendant, nor that the trailer was his home. The only pertinent evidence was that the defendant expressly disclaimed ownership of the tools in his conversations with the officers. Where a defendant neither claims ownership nor demands the return of the property alleged to have been illegally seized, he cannot complain of its seizure or its use in evidence against him. (*People* v. *Gambino,* 12 Ill.2d 29; *People* v. *Perry,* 1 Ill.2d 482; *People* v. *Edge,* 406 Ill. 490; *People* v. *Tabet,* 402 Ill. 93.) In *Perry,* we had occasion to examine the origin, development and rationale of the rule excluding evidence secured as the result of an illegal search and seizure, and observed that the provisions of neither the State nor Federal constitution regulating searches and seizures bar the admission of evidence thus obtained; and that the real reason for the rule of exclusion lies in the protection of the privilege against self incrimination guaranteed by the fifth amendment of the United States constitution, and by section 10 of article II of the Illinois constitution. That being the case, exclusion is available only to one whose constitutional rights have in fact been invaded by illegal search and seizure. The defendant does not fall within this classification.

Defendant suggests that the witness Evans, who testified that the marks on the safe matched the burr on the crowbar, was not properly qualified as an expert witness, and that the matters concerning which he testified were not such as required peculiar skill or knowledge, but were within the range of ordinary intelligence and observation, rendering opinion evidence inadmissible. No citations are offered in support of this premise. We believe that testimony concerning the matching of tool marks is as much a subject for the expert as that concerning the matching of fingerprints. Certainly the facts brought out by Evans were

not within the realm of ordinary observation. Before any deductions were possible, photographs had to be taken of the damaged portions of the safe. This was done by the use of a highly specialized instrument—a specially constructed, self-focusing and enlarging fingerprint camera. While the prints obtained as a result of this process clearly show the peculiar marks left by the tool, yet only an expert would be qualified to compare them with the burr on the crowbar. The evidence established that Evans was well qualified by training and experience to make the comparison. He received his specialized training at the Institute of Applied Science in Chicago, and at the time of the trial had been employed by the State for over eight years, during which time he had investigated over 200 burglaries, using methods similar to those employed in the present case. He testified that a comparison of marks left by a tool with the tool itself is not possible in every case; and that it is feasible only when such marks indicate a pronounced peculiar characteristic in the tool used. There is no reason to doubt either the truth of his testimony or the accuracy of his observations. His testimony, relevant and material to the issues in the case, was competent. The trial court did not err in admitting this proof.

Defendant contends that the evidence does not establish his guilt beyond a reasonable doubt, especially in view of the testimony of the alibi witnesses. Alibi is an affirmative defense. Where the *corpus delicti* is proved, together with evidence tending to show the guilt of the defendant, the burden of establishing the alibi rests upon him, although upon the whole case his guilt must be proved beyond a reasonable doubt. (*People* v. *Wheeler,* 5 Ill.2d 474; *People* v. *Mero,* 4 Ill.2d 327; *People* v. *Renallo,* 410 Ill. 372.) The law charges the jury with the responsibility of determining the credibility of the witnesses and the weight to be given their testimony and we will not substitute our judgment for that of the jury merely because the evidence is

conflicting. (*People* v. *Wheeler,* 5 Ill.2d 474; *People* v. *Mosher,* 403 Ill. 112.) Neither will we reverse a judgment of conviction on the ground that the evidence is insufficient to sustain the finding of guilt unless it can be said that there is clearly a reasonable and well-founded doubt of the guilt of the accused and the verdict is palpably contrary to the weight of the evidence. (*People* v. *Mathews,* 406 Ill. 35.) We have often stated that evidence of an alibi cannot be disregarded where the only evidence contradicting it rests upon the identity of the defendant as the person who committed the crime, and while the identification and whereabouts of the defendant when the crime was committed are questions for the jury, yet where, from the entire record, there is a reasonable doubt of the guilt of the defendant because of the uncertainty of identification the conviction cannot stand. (*People* v. *Gooden,* 403 Ill. 455; *People* v. *Ricili,* 400 Ill. 309; *People* v. *Burr,* 356 Ill. 452.) Here, however, the evidence connecting the defendant with the crime, though circumstantial, is positive in nature and of the highest character. This conviction does not rest upon uncertain identification. From a careful examination of all the evidence, including the testimony of the alibi witnesses, we have no clear and well-founded doubt of the guilt of the defendant. Absent that doubt, no reason exists for reversing the judgment if the record is free from substantial prejudicial error.

Other errors have been argued, including those predicated upon the giving and refusal of instructions and the admission of certain testimony over objection. These assignments have been carefully considered and found without merit. The instructions as a whole were applicable to the facts and fairly stated the law of the case. The record is remarkably free from error and clearly shows that the court carefully protected the rights of the defendant throughout the trial. The judgment of the circuit court will be affirmed.

*Judgment affirmed.*