THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, *v.* SYLVESTER JONES *et al.*, Defendants-Appellants.

First District (5th Division)   No. 63050

Opinion filed September 2, 1977.

James J. Doherty, Public Defender, of Chicago (Donald S. Honchell, Assistant Public Defender, of counsel), for appellants.

Bernard Carey, State's Attorney, of Chicago (Laurence J. Bolon, Linda Ann Miller, and Jeffrey Singer, Assistant State's Attorneys, of counsel), for the People.

Mr. JUSTICE WILSON delivered the opinion of the court:

Defendants Charles Terry, Anthony Mitchell, and Sylvester Jones were indicted for robbery, rape, and aggravated kidnapping. (Ill. Rev. Stat. 1973, ch. 38, pars. 18—1, 11—1, and 10—2.) In a bench trial, each defendant was found guilty as charged. They were sentenced to six to 18 years in the penitentiary. On appeal defendants contend that: (1) they were not proved guilty of the offense of rape, since the State did not prove that the prosecutrix had intercourse with a person who was not her spouse; (2) they were not proved guilty of the offense of aggravated kidnapping, since rape was not committed; (3) they were deprived of their right to the effective assistance of counsel; (4) their aggravated kidnapping convictions must be reversed because the aggravated kidnapping was committed as a means to committing the rape; (5) the common law record indicating three concurrent sentences is erroneous and must be corrected since the report of proceedings indicates that only a single sentence was imposed on each defendant. We affirm.

Before trial, defense counsel made a "motion to quash the indictment on the basis of collateral estoppel" and the motion was denied. The following relevant evidence was heard.

The prosecutrix testified that when the incident took place she was 40

years old and the mother of three children whose ages were 24 years, 23 years, and 14 years. On March 30, 1974, she had dinner and a couple of drinks with a friend in Adolph's Restaurant, an establishment in Chicago, Illinois. She was walking, at 2:30 or 3 a.m., on St. Clair Street after leaving Michigan Avenue. She had left the restaurant alone, walked south on Michigan Avenue, turned left on Erie Street, and then right on St. Clair Street. She was grabbed by two men and dragged into an automobile. In court, she identified defendant Jones as one of the men who grabbed her. She could not remember who the other man was, but she further testified that he resembled defendant Jones.

The prosecutrix testified that the automobile was parked in the right hand lane away from the curb. In the front seat were two other men; in court, she identified defendant Mitchell as one of those men. When she was grabbed on the street, she started screaming and lost her purse and a shoe. She was placed in the back seat of the automobile with her head and upper body lying on the knees of the two men in the back seat and her legs and knees on the floor. Her face was held down in the knees of Terry Mitchell, the "juvenile" seated on the left side of the back seat. While "at the trial," an adjudicatory hearing held in Juvenile Court, she learned the name of the "juvenile."

Once in the automobile, the prosecutrix began screaming and one of the men in the back seat told her to stop screaming or they would kill her. She further testified that she stopped screaming. "What do you want?" the prosecutrix asked. No answer was given. She then asked where they were taking her and the juvenile replied that they were letting her out on Lake Shore Drive. During the trip, her wristwatch and diamond engagement ring were taken. She recalled that the ring was taken by the man sitting on the left side of the back seat and the watch was taken by the man sitting next to him.

When the automobile stopped, she got out along with the four men in the automobile. Although she identified Anthony Mitchell, Sylvester Jones, and Terry Mitchell as three of those men, she could not positively identify the fourth. She remembered that he wore an earring and a turban, stood approximately 5'6" and had a build which was "slight, thin and tall." The four men gathered around her after getting out of the automobile. As the prosecutrix looked around, she noted, "This isn't Lake Shore Drive." However, no one gave a response. She further testified that she then started crying and said, "Please take me back." One of the men (she could not recall who) said, "Let's get her in the house." She was then grabbed by two of the men and she again started screaming. The prosecutrix recalled defendant Mitchell and defendant Jones standing to her right and the "juvenile" standing to her left. She was grabbed by either arm, but she did not know which of the men grabbed her. "Grab

her legs," someone then said. The prosecutrix did not know who made that statement. Also, since her eyes were closed and she was still screaming, she did not know who grabbed her legs. At that point, her arms were still being held.

She went on to testify that she was carried by her legs and arms. Because she was still screaming, someone said, "Shut her mouth," but she did not know who said it. She then felt someone put his hand over her mouth, however she did not know whose hand it was. In addition, she testified that she stiffened her body and went limp, then she was dropped and began screaming again. She was dropped three or four times.

The prosecutrix further testified that she was taken into a house with two floors. She was taken into an empty kitchen on the first floor and then up some stairs. While being taken up the stairs, she began screaming again, grabbed the railing and turned her face toward the railing to keep her mouth from being covered. The prosecutrix could not see who was doing what, because her face was toward the wall. As she tried to turn her face to the wall, someone pulled her hair. At the top of the stairs, she was taken into a room with no furniture. No lights were on in the room, but the room had a window. Light was shining through the window. In the room, two of the men argued over her engagement ring, one of whom was defendant Mitchell, the driver of the automobile.

She wore slacks, pantyhose and underpants which were "ripped off" by the "juvenile"; her sweater and shirt were left on her body. She was placed on the floor by the "juvenile" and one of the other men, whose identity she did not know. Once on the floor, one of the men, which one it was she did not know, held her arms. The "juvenile" then put his penis in her vagina. She heard a police siren and saw the other two men run to the window. Blue lights flashed through the room and one of the men said, "The police are here." Hence, the two men off to the side and the man holding her arms scattered and began running from the room. Upon coming into the room, the police found the prosecutrix and Terry Mitchell, the "juvenile." The prosecutrix then had on her sweater and shirt, however she wore no underpants, pantyhose or slacks. "Freeze," a policeman ordered. The prosecutrix jumped up against a wall and then she was put in another room with the police officers. In that room, she became startled and screamed and she had her arms around a policeman.

From the house the police officers took the prosecutrix to Cook County Hospital, where she was examined by a doctor and her head and spine were X-rayed. She was then transported to a police station, where she saw the four men and identified them as being the abductors. Also, she indicated which man was the rapist. The prosecutrix testified that she had never been, and was not then, married to any of the defendants. Defendant Terry took her keys in the automobile, but she felt unable to

positively identify any defendant as Terry. She further testified that she did not willingly go to the house with the men.

On cross-examination the prosecutrix testified that defendant Terry was in the back seat of the automobile. He grabbed her wristwatch and said, "let me have that." Since her face was down in the lap of the "juvenile," she was unable to see who was talking. She thought defendant Terry said, "Stop screaming or we will kill you," because the words came from his direction. Throughout the time she was in the automobile, defendant Jones occupied the front passenger seat. At the house, she had no personal contact with defendant Mitchell or Jones. She might have had physical contact with defendant Terry; since her eyes were closed and she was screaming, she could not identify who did what.

Asserting "if there is a defense of consent, we are entitled to go into the question," defense counsel began an inquiry into the marital status of the prosecutrix. She testified that she was not married, but she had been divorced twice. On cross-examination she further testified that she arrived at Adolph's Restaurant between 11:30 and 12 o'clock. She drank alcohol with Mr. and Mrs. McLaughlin and saw a gentleman named Robert at Adolph's bar. She had gone to Adolph's Restaurant with the McLaughlins from another Rush Street bar whose name she could not remember, where she had something to drink. After the McLaughlins left Adolph's Restaurant, she remained there for approximately an hour and had coffee with Robert. She did not ask Robert to escort her home and she did not call a taxi. Her home was located six or seven blocks away.

After the prosecutrix concluded her testimony, the defense counsel objected to limits placed by the court on the cross-examination of the prosecutrix as to her habits "where it is a case in which as I pointed out there is a possibility of a defense of consent."

William Delaney, the next witness presented by the State, testified that he was a Chicago police officer on patrol with a partner in a marked car in the early morning hours of March 30, 1974. He received a call and went to 205 South Albany, where he and his partner entered the front door of a building. They observed defendants Terry and Jones on a stairway. The officers searched them and recovered a ladies' watch from defendant Terry. They then turned the men over to other officers.

Delaney also testified that he and his partner went up the stairs into a room where they found the prosecutrix and the juvenile. The juvenile was fully clothed. The prosecutrix, however, was "naked from the waist down." As the policemen entered the room, she grabbed Delaney's arm and said, "Don't leave me, please don't leave me." Meanwhile, Delaney's partner entered another room and returned with defendant Mitchell. The prosecutrix then put on her slacks and Delaney took her to Cook County Hospital where they stayed for five hours as she was examined. Delaney

went on to testify that at the hospital she grabbed his arm and "wouldn't let go." Along her forehead and jaw, she had bruises and hair was torn out of her scalp. Delaney saw the hair on her sweater. From the hospital, they went to the police station where the defendants had been taken.

Defense counsel did not undertake a cross-examination of Delaney. Thomas Tranckitello, the final witness presented by the State, testified that he was a Chicago police officer on March 30, 1974. At 6 a.m. on March 30, he arrived at Cook County Hospital and saw the prosecutrix. He observed that her clothing was wrinkled, she wore hospital slippers and her face was bruised. Bumps were on her head and patches of hair were missing from the scalp. In the hospital emergency room at about 11 a.m., he conversed with the prosecutrix. Also, he conversed with her at the police station and asked her to select, from the four suspects, who were in the station, the one with whom she had sexual intercourse. She picked out Terry Mitchell. When this identification was made, Terry Mitchell was in the same room with all of the defendants.

Officer Tranckitello further testified that, in the police station lockup, he had a conversation with defendant Terry. Before he asked defendant Terry if he wanted to tell what happened, Officer Tranckitello advised defendant Terry of his *Miranda* rights. Defendant Terry stated that he wanted to speak and he told the officer that he and the other defendants had been driving around the Old Town area and they picked up the prosecutrix who agreed to go with them and who had been hitchhiking. In addition, Tranckitello was told by defendant Terry that the prosecutrix had given him her watch. The officer also talked to defendant Mitchell who, after being advised of his *Miranda* rights, told Tranckitello that the defendants had picked up the hitchhiking prosecutrix in Old Town. Officer Tranckitello also testified that defendant Mitchell told him the prosecutrix had willingly entered the automobile and defendant Mitchell admitted to the officer that he heard her scream. Defendant Jones, after being advised of his *Miranda* rights, told Tranckitello of picking up the prosecutrix where she was hitchhiking in Old Town. When asked by the officer if she had ever expressed an unwillingness to go along, defendant Jones said she screamed because she saw a dog.

On cross-examination Officer Tranckitello testified that defendant Mitchell informed him that the prosecutrix did not begin screaming until after they were departing from the automobile when it stopped at the house.

After the State rested, defense counsel moved for the discharge of defendant Terry because the identification of him as an offender by the prosecutrix was inadequate. Because accountability had not been proved, he asked for a favorable finding as to the other defendants. The court denied the motions. Subsequently, alleging that the State's answer to

discovery was inaccurate, defense counsel sought a mistrial, but it was not granted. Defense counsel again moved for discharge because the State failed to show accountability and the identification of defendant Terry as an offender. Once again, the motion was denied by the trial judge. In response, defense counsel said "I find I cannot put on any defense testimony. I must stand on Your Honor's ruling and take it from there." Thus, no defense witnesses were called. In his closing argument, defense counsel asserted the doctrine of collateral estoppel and contended that the prosecutrix consented to what the defendants did. In its rebuttal closing argument, the State noted that "no testimony was ever taken even regarding the consent defense, other than the State's Attornies [*sic*] have testimony from the police officer." The court then found the defendants guilty of rape, aggravated kidnapping, and robbery.

Defense counsel's post-trial motion asserted grounds for discharge under the doctrine of collateral estoppel. The motion was denied. At a sentencing hearing, the trial judge declared, "The Court does hereby sentence you, each one of you to a minimum of six and a maximum of 18 years in the Illinois State Penitentiary." The common law record states, however, "a term of six to 18 years concurrent on each count of the indictment."

OPINION

■■ At the outset, defendants contend that they were not proved guilty of the offense of rape, since the State failed to prove that the prosecutrix was not the wife of Terry Mitchell. In order to establish the offense of rape, the State must prove that the female was not the wife of the male with whom she had sexual intercourse. (*People v. Alexander* (1973), 13 Ill. App. 3d 635, 301 N.E.2d 69; see Ill. Rev. Stat. 1973, ch. 38, par. 11—1.) The marital relation of the prosecutrix and Terry Mitchell "is a matter provable indirectly or by the surrounding facts and circumstances." (*In re Williams* (1974), 24 Ill. App. 3d 593, 598, 321 N.E.2d 281.) An inference that the prosecutrix was not Terry Mitchell's wife arose from the following facts: the surnames of the parties are dissimilar; the statement of the prosecutrix that she learned Terry Mitchell's name when she was "at the trial"; the age of the prosecutrix coupled with her reference to Terry Mitchell as the "juvenile" with whom she had sexual intercourse. The inference of non-marriage was not rebutted by any evidence. Therefore, we conclude that the circumstantial evidence adequately showed the prosecutrix was not the wife of Terry Mitchell. In our judgment, defendants were proved guilty of the offense of rape under the theory of accountability. Accordingly, we need not consider defendant's contention that they were not proved guilty of aggravated kidnapping since the offense of rape was not shown.

■■■ Defendants contend that they were denied their right to the effective assistance of counsel. As support for this contention, they assert their counsel's failure at trial to call them as witnesses to testify to the consent defense. A contention of lack of effective assistance of counsel presents the question of whether a defendant was represented by incompetent counsel as manifested by the counsel's manner of carrying out his duties at trial. (See *People v. Bouse* (1977), 46 Ill. App. 3d 465, 360 N.E.2d 1340.) If the conduct which constitutes incompetency of counsel reduces the trial to a farce, there is a denial of the right to effective assistance of counsel. (*People v. Hawkins* (1974), 23 Ill. App. 3d 758, 320 N.E.2d 90.) The decision not to call defendants as witnesses was an exercise of judgment. (*People v. Keagle* (1955), 7 Ill. 2d 408, 131 N.E.2d 74.) Defense counsel had observed the demeanor of defendants, and their taking the stand "might have done 'more harm than good.'" (*People v. Martin* (1970), 44 Ill. 2d 489, 490, 256 N.E.2d 337.) In any event, an error of judgment does not afford a basis for finding incompetency of counsel which reduces a trial to a farce. (*People v. Somerville* (1969), 42 Ill. 2d 1, 245 N.E.2d 461.) Thus, we conclude that defendants were not denied their right to the effective assistance of counsel.

Defendants also contend that they were each sentenced to a single term of imprisonment. According to the report of proceedings, the trial judge imposed sentence by saying, "The Court does hereby sentence you, each one of you to a minimum of six and a maximum of 18 years in the Illinois State Penitentiary." On the other hand, the common law record states that each defendant was sentenced to "a term of six to 18 years concurrent on each count of the indictment." As in *People v. DePratto* (1976), 36 Ill. App. 3d 338, 343 N.E.2d 628, the common law record and the report of proceedings are in conflict. The report of proceedings, in *DePratto*, showed the trial judge failed to say on which of three counts he was imposing sentence. The common law record indicated that he imposed sentence on each count and the three sentences were to be served concurrently. In resolving the conflict, the court in *DePratto* held that the report of proceedings should prevail. As support for that holding, however, the court cited *People v. Gregory* (1966), 77 Ill. App. 2d 188, 222 N.E.2d 182, and *People v. Williams* (1963), 27 Ill. 2d 327, 189 N.E.2d 314. In both of these cases, it was held that common law records ordinarily import verity, but a reviewing court should resolve a conflict between the common law record and the report of proceedings by looking at the record as a whole. (See *People v. Webb* (1976), 38 Ill. App. 3d 629, 347 N.E.2d 486.) In the instant case, we think the inconsistencies must be resolved by viewing the record as a whole.

■■ Our review of the record as a whole discloses that defendants were indicted for robbery, aggravated battery, and rape; that evidence

was introduced as to all of the counts; that there was a finding of guilty on each count, and that defendants were sentenced in accordance with these findings of guilty. Thus, we conclude the trial judge, as reflected in the common law record, obviously intended to enter complete judgments by imposing an individual sentence on each finding of guilty. Indeed, we are convinced on the basis of the record as a whole that each defendant received a sentence of six to 18 years on each count of the indictment, the sentences to run concurrently.

We do not agree with defendants' alternative contention that under *People v. Williams* (1975), 60 Ill. 2d 1, 322 N.E.2d 819, they are entitled to reversal of their aggravated kidnapping convictions. In *Williams*, the court considered the defendant's motivations at the time his illegal acts were committed and the court reasoned that when two offenses are not independently motivated, only a conviction for the greater offense can stand. Here, defendants argue that the aggravated kidnapping was part of the same transaction involving the rape, since the aggravated kidnapping was motivated by an intent to commit the rape.

■■ Nevertheless, in *People v. King* (1977), 66 Ill. 2d 551, 363 N.E.2d 838, the court rejected the use of the independent motivation test. According to *King*, convictions with concurrent sentences can be entered when incidental or closely related acts give rise to multiple offenses which are not lesser included offenses by definition. In the present case, we find that the offenses of rape and aggravated kidnapping arose from a series of closely related acts and these offenses are not lesser included offenses; therefore, since concurrent sentences were imposed, each defendant's conviction for aggravated kidnapping should be affirmed. *People v. Richardson* (1977), 50 Ill. App. 3d 550, 365 N.E.2d 603.

For the reasons presented, the judgment of the circuit court of Cook County is affirmed.

Affirmed.

LORENZ and MEJDA, JJ., concur.