THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, *v.*
JOSEPH DWAYNE SWANSEY, Defendant-Appellant.

First District (4th Division)   No. 77-109

Opinion filed July 20, 1978.

Sam Adam and Alan D. Blumenthal, both of Chicago, for appellant.

Bernard Carey, State's Attorney, of Chicago (Lee T. Hettinger and Mary Ellen Dienes, Assistant State's Attorneys, of counsel), for the People.

Mr. JUSTICE ROMITI delivered the opinion of the court:

The defendant, Joseph Swansey, appeals his conviction, following a bench trial, for the murder and rape of Lorna Martin. Defendant seeks a new trial, contending: (1) the trial court erred in failing to suppress evidence and testimony obtained as a result of an illegal search; (2) the trial court's determination that defendant was sane at the time of the killing was contrary to the manifest weight of the evidence; (3) the trial court on its own motion should have ordered a competency hearing for the defendant; (4) defendant's trial attorneys were incompetent.

We affirm the judgment of the trial court.

The evidence as to defendant's guilt was overwhelming, and he does not challenge its sufficiency. The victim's body was found in the basement of the defendant's home. After questioning by police he confessed to having had forcible sexual intercourse with the victim, and to having struck the blows which caused her death. Defendant does, however, assert that this damaging evidence should not have been admitted at trial because it was obtained as the result of an unconstitutional search. The pertinent facts follow:

On Saturday, January 19, 1974, Investigator James Breckenbridge was assigned to investigate the apparent abduction of the victim who had been reported missing by her parents the day before. A witness had seen a young girl being dragged down an alley in that neighborhood. Breckenbridge had a description of a possible suspect, a husky male Negro, age 12 to 15, five feet, five inches, wearing a dark brown ¾-length coat, a black knit cap, and dark trousers. A neighborhood boy told

Breckenbridge that a friend of his, the defendant, had clothes fitting the clothing description of the suspect. The defendant was two days short of being 15 years of age at the time of the offense and was 17 at the time of trial. Defendant's home had been searched by police, with the consent of defendant's mother, the evening before. Breckenbridge apparently knew this because he had a list of homes in the area that had not yet been searched and the list omitted defendant's home. However, Breckenbridge also knew that bloodstained clothes and a book belonging to the victim had been found across the alley near that home. Breckenbridge and two other investigators went to the home, but no one was there. Neighbors informed them that Mr. and Mrs. Swansey and two of their sons had driven away. At that time defendant's 13-year-old brother, Micah, appeared. According to Breckenbridge, Micah informed them that he lived at the home and asked if they wanted to go in, saying that police had been there and searched the home and it was all right. Micah opened the door with a key and Breckenbridge and two other investigators followed him inside. Two investigators who had apparently arrived separately remained in a car outside. Breckenbridge observed that a large dog, confined in a small cage in the basement, was barking, so he closed the door to the basement stairs. He and the other officers sat down at the dining room table and talked with Micah as they waited for his parents and two brothers to return. Breckenbridge showed Micah a photograph of the victim and ascertained that Micah knew her. He also told Micah they had found some of her bloodstained clothes and indicated that they did not know whether she was dead or alive. Breckenbridge then asked Micah where around the house a body could be hidden. Micah told him they had a crawl space where a body could be hidden. He said he would show them and proceeded down the stairway to the basement. There Micah cleared away some toys and moved a sliding board to reveal the crawl space. The victim's body was found inside the space. Micah was not advised of his right to refuse permission for a search, nor was he told that a search warrant was ordinarily required. Breckenbridge testified that his purpose in coming to the home was to interview the defendant in the presence of his parents; his purpose was not to search the house. However when Micah responded to his question about hiding a body with the information about a crawl space, he became concerned that the victim might be in there alive.

Micah's testimony concerning these events was substantially the same, with the following differences. The police asked him if it was his house and if they could look around. He told them they could. As he approached the door with his key, in order to open it, one policeman took the key from him, opened the door, and about five police walked in. Two looked around downstairs while the other three went upstairs. He was

then asked about the best place to hide a body, and he responded that the crawl space was the best place. The police asked where that was and he said "come on, I'll show you." The victim's body was then found in the crawl space. Micah said that his father's general rule was that he was not to let anyone else in the house while his father was away. He was not given any special instructions about letting people in that day. The night before the victim was found, while Micah was at home, his mother allowed the police to search the home.

Micah's father testified that Micah had a key to the house from the time he was nine years old. He never specifically told Micah not to let police in the house but he had given him general instructions to only use the key for his own access and to exclude all others when he was in the house.

Micah's mother testified that on Friday night (the day before the victim was found) she had consented to a police search of her home. That night she also allowed Micah and his two brothers to help look for the victim outside. Prior to the police search that Friday night, when she left the house for several hours, she instructed her sons not to open the door for anyone. She also testified that her children were under general instructions to only use their keys to let themselves in and out, and not to let anyone else in.

## I.

It is defendant's contention that the consent to this search was invalid because Micah lacked the capacity to consent and because his consent was not voluntarily given.

■■ One factor on which defendant relies is Micah's young age, 13 at the time of the search. But defendant has cited no case, nor has our research uncovered any in which age alone was held to be dispositive in determining that consent was not validly given. Where consent by minors has been at issue it is clear that age was only one of a number of factors considered by the courts. Thus in *People v. Sommer* (1977), 45 Ill. App. 3d 459, 359 N.E.2d 1190, and *People v. Kincaid* (1977), 51 Ill. App. 3d 975, 367 N.E.2d 456, the age of the two consenting people, 17 and 16 respectively, was but one factor considered, along with the time of the intrusion, whether there was some initial resistance or refusal, and whether there was knowledge of a right to refuse. In those cases the consent was held invalid, but in *Davis v. United States* (9th Cir. 1964), 327 F.2d 301, consent to an intrusion was held to be valid, even though given by an eight year old, because there was no evidence of police subterfuge or a lack of authority in the child to let people in the door. We cannot, therefore, isolate the age of Micah from the other factors of the case. But defendant also seeks to establish Micah's incapacity to consent because he had no ownership interest in the home. It is well established, however,

that where two people have an equal right to the use or occupancy of a home, either may consent to a search of that home. *People v. Perroni* (1958), 14 Ill. 2d 581, 153 N.E.2d 578, *cert. denied* (1959), 359 U.S. 1004, 3 L. Ed. 2d 1033, 79 S. Ct. 1145; *People v. Haskell* (1968), 41 Ill. 2d 25, 241 N.E.2d 430; *People v. Johnson* (1975), 32 Ill. App. 3d 36, 335 N.E.2d 144.

■■ Here, Micah had keys to his home for his use since he was nine years old. Although his parents testified that he was under instruction not to let others in, the trial court specifically discounted this testimony, noting that it came in response to leading questions by counsel. Also the testimony did not establish whether these purported rules were meant to apply to police officers in search of a missing person. Indeed, Micah was present when his mother gave the police permission to search the home for the victim the night before she was found. She also gave him permission to help in a search of the neighborhood. We have noted that his age was not an automatic barrier to his capacity to consent. On that point the trial judge, who observed Micah's testimony, stated on the record that he was a "very intelligent little boy." Considering all these factors we conclude that the trial court was justified in finding that Micah had the capacity and authority to consent to the search.

■■ Defendant also questions the voluntariness of this consent. The determination of voluntariness by the trial court should be accepted on review unless clearly unreasonable. (*People v. Sommer* (1977), 45 Ill. App. 3d 459, 359 N.E.2d 1190; *People v. DeMorrow* (1974), 59 Ill. 2d 352, 320 N.E.2d 1.) And the totality of the circumstances is to be considered in determining voluntariness. *People v. Anderson* (1976), 42 Ill. App. 3d 1040, 356 N.E.2d 1076.

■■ Micah's testimony, as well as that of the police, established that he voluntarily allowed the police to enter his home. Even Micah's testimony that the key was grabbed from him, testimony contradicted by the police, does not indicate lack of consent for he also testified that he was heading for the door to open it when the police took the key. The failure to advise Micah of his right to refuse entry to the police, while certainly a factor to be considered, does not automatically invalidate the consent. (*People v. Sommer* (1977), 45 Ill. App. 3d 459, 359 N.E.2d 1190.) The entry here was made in the daytime, with no reluctance at all on Micah's part, and indeed was made with his express consent. Under these circumstances the trial court's finding of voluntariness was not unreasonable.

■■ We also note that after the initial intrusion was consented to, the police were presented with exigent circumstances which independently justified the search of the basement, without reference to consent to search. They knew that some of the victim's clothes had been found near the home. They also had some information raising the possibility that the

defendant wore clothes resembling the suspect's, as well as being about his age. It has not been contended, and we do not find, that this information gave the police probable cause to arrest the defendant. But when Micah then told the police that a body could be hidden in the crawl space of the home, the police were presented with the real possibility that the victim might still be alive in that location. Investigator Breckenbridge testified that this was his concern and on the basis of this testimony the trial court found that one justification for the search was the possibility that the victim might still be alive and in need of aid. Under these facts we conclude that the officers were presented with exigent circumstances, the possibility of a life in danger, which justified a search once they were validly in the house and were told by Micah of the possible hiding place. *People v. Clayton* (1975), 34 Ill. App. 3d 376, 339 N.E.2d 783; *People v. Polito* (1976), 42 Ill. App. 3d 372, 355 N.E.2d 725.

## II.

At trial defendant sought to establish the affirmative defense of insanity. On appeal he contends the trial court's determination that he was sane at the time of the offense was contrary to the manifest weight of the evidence.

The issue before the trial court was whether, at the time of the offense, the defendant lacked the substantial capacity to appreciate the criminality of his conduct or to conform his conduct to the requirements of the law because he was suffering from a mental disease or defect. (Ill. Rev. Stat. 1975, ch. 38, par. 6—2.) Defendant presented three expert witnesses on the issue. Dr. Cheatham, a clinical psychologist, testified only that her examination of the defendant in February 1974 showed that he had "some kind of anxiety reaction" and that a psychiatric examination should be given to rule out psychosis. Dr. Ziporyn, a psychiatrist, also examined the defendant in February 1974. He testified that on the date of the offense the defendant was suffering from a psychoneurotic anxiety state, which the doctor characterized as a mental disease, and as a result of which the defendant was unable to conform his conduct to the requirements of the law. Dr. D'Agostino, a child psychiatrist, examined the defendant on three occasions beginning on December 2, 1975. It was his opinion that at the time of the offense the defendant was under emotional stress and had a personality disorder of a non-psychotic type. However he also testified that the defendant was not suffering from a mental disease or defect at the time of the crime and could discern right from wrong, although he was not sure whether he could conform his conduct to the requirements of the law.

The State countered this testimony with that of Dr. Kelleher, also a psychiatrist, who examined the defendant on June 26, 1975. It was Dr.

Kelleher's opinion that at the time of the offense the defendant was not suffering from a mental disease or defect. The doctor also testified that he considered anxiety neurosis to be an emotional illness, not a mental disease or defect. One suffering from a neurosis, according to the doctor, "[i]s in a sense in control. The neurosis does not customarily lead him to do anything which is grossly distorted as compared to average everyday behavior." The doctor's diagnosis was that the defendant was a passive-aggressive type; this he termed a personality disorder, not a mental disease or defect.

The question of defendant's sanity was one for the trial court as the finder of fact. (*People v. Ward* (1975), 61 Ill. 2d 559, 338 N.E.2d 171; *People v. Ford* (1968), 39 Ill. 2d 318, 235 N.E.2d 576.) It is clear that the court's determination was necessarily based on its evaluation of the conflicting testimony of expert witnesses. The trial court's evident decision to rely on the testimony of one psychiatrist, Dr. Kelleher, and reject that of another was well within the court's discretion. (*People v. Greenfield* (1975), 30 Ill. App. 3d 1044, 333 N.E.2d 36; *People v. Ward* (1974), 19 Ill. App. 3d 833, 313 N.E.2d 314, *affirmed* (1975), 61 Ill. 2d 559, 338 N.E.2d 171.) Nor was that determination so improbable or unsatisfactory as to raise a reasonable doubt as to the defendant's sanity. *People v. Ward* (1975), 61 Ill. 2d 559, 338 N.E.2d 171.

### III.

■■ Defendant also contends that although he did not specifically raise the issue at trial, the trial court should have *sua sponte* ordered a competency hearing for him. By statute in Illinois (Ill. Rev. Stat. 1975, ch. 38, par. 1005—2—1), a defendant is unfit to stand trial if, because of a mental or physical condition, he is unable to understand the nature and purpose of the proceedings against him or to assist in his own defense. The issue may be raised by the court, the defendant, or the State. A fitness hearing is required only if a bona fide doubt of the defendant's fitness is raised. *People v. McCullum* (1977), 66 Ill. 2d 306, 362 N.E.2d 307; *People v. Shrake* (1962), 25 Ill. 2d 141, 182 N.E.2d 754.

Defendant cites the testimony of Dr. D'Agostino as raising a bona fide doubt on the issue. Specifically he cites the doctor's testimony that defendant *could* have been suffering from a type of mental decompensation, in which "* * * the mind is still working, it is just that it is not able to do its functioning as well and therefore the ability to interpret reality in terms of what is going on under decompensation is impaired and the person may not be able to distinguish fantasy from reality, may not be able to distinguish his own person from the person of others." While this was the doctor's definition of mental decompensation, it was never his testimony that the defendant was suffering from this

condition at any time. He testified only that the experiences of the defendant leading up to the offense could have been a prodrome, or premonitory symptom, of mental decompensation. And on cross-examination he testified that he could not say that he had an opinion based on a reasonable degree of medical certainty that the condition existed. Further, Dr. Ziporyn's testimony was that when he examined the defendant, he was coherent, cooperative, and understood the nature of the charges againt him.

On this record we find no error in the failure of the trial court to *sua sponte* order a fitness hearing for the defendant.

## IV.

■■■ Finally, defendant argues that he was denied a fair trial by the incompetence of his trial counsel. Such an allegation must be judged in the context of the entire record. (*People v. Smith* (1977), 53 Ill. App. 3d 395, 368 N.E.2d 561.) Our review of the record establishes that defendant was vigorously represented by able trial counsel. Counsel presented and argued motions to suppress, effectively cross-examined witnesses, and clearly presented the defendant's theory and evidence of the affirmative defense of insanity. Defendant's focus on isolated instances where his two trial attorneys disagreed on trial tactics or where counsel experienced some difficulty in phrasing questions to the court's satisfaction is misplaced. (*People v. Clark* (1977), 47 Ill. App. 3d 624, 365 N.E.2d 20.) Nor is counsel's failure to move for a competency hearing evidence of counsel's incompetence; we have already found that there was no basis in the record for such a hearing. Defendant received the effective assistance of two attorneys at his trial. Certainly this is not an instance where the trial was reduced to the level of a sham or farce. (*People v. Jones* (1977), 53 Ill. App. 3d 197, 368 N.E.2d 452; *People v. Fleming* (1971), 50 Ill. 2d 141, 277 N.E.2d 872.) Nor has defendant demonstrated any substantial prejudice resulting from the representation he received. *People v. Witherspoon* (1973), 55 Ill. 2d 18, 302 N.E.2d 3.

For the foregoing reasons, the judgment of the trial court is affirmed.

Affirmed.

DIERINGER and LINN, JJ., concur.