576 So.2d 953 (1991)
Tommy SAAVEDRA, Appellant,
v.
STATE of Florida, Appellee.
No. 88-561.
District Court of Appeal of Florida, First District.
April 4, 1991.
*954 Elizabeth L. White and William J. Sheppard of Sheppard and White, P.A., Jacksonville, for appellant.
Robert A. Butterworth, Atty. Gen. and Bradley R. Bischoff, Asst. Atty. Gen., Tallahassee, for appellee.

ON MOTION FOR REHEARING AND MOTION FOR REHEARING EN BANC

[Original opinion at 15 F.L.W. D2732]
The motions are denied except that the original opinion dated November 8, 1990 is withdrawn and the following opinion is substituted therefor:
MINER, Judge.
In this appeal, Tommy Saavedra challenges his convictions and sentences for burglary, armed kidnapping and three counts of sexual battery. With respect to the sexual battery convictions and sentences, he urges that his multiple punishments for offenses of the same character and type committed against the same person violated double jeopardy principles. He also argues that the trial court erred in denying his motions to suppress and for severance of defendants, in impermissibly restricting his ability to defend against the crimes charged and in applying sentencing guidelines in effect at the time the offenses were committed. Finding no merit in any of appellant's arguments, we affirm the convictions and sentences appealed from.
By amended information, Saavedra and a co-defendant, Donald Teater,[1] were charged with burglary, armed kidnapping *955 and three counts of sexual battery which offenses occurred when they broke into their next door neighbor's home, forcibly removed a 12 year old girl from the home and repeatedly assaulted her in a nearby park. Prior to trial, appellant filed a motion to sever defendants and a motion to suppress physical evidence, certain statements made by him at the time of his arrest and the pre-trial and any in-court identification of him by the prosecuting witness. These motions were denied without elaboration.
At the suppression hearing, the following facts were established.
During the early morning hours of June 25, 1987, Jacksonville police officer Robert Benfield received a report that a sexual battery had occurred at 366 Tallulah Avenue. When he arrived at the scene, the victim, K.A., informed him that her assailants lived next door at 360 Tallulah Avenue. Benfield went to the home described and knocked on the door, but no one answered. The lights were out and the house was dark. Officers McLean and Pease arrived and, upon looking in the windows of the house with a flashlight, saw two persons lying on a bed. The officers then began to knock on the side of the house to arouse the occupants.
Officer Benfield went to the rear of the house and knocked on the back door. A boy (later identified as appellant's son, Tommy Saavedra, Jr.) appeared at the door. Officer Benfield testified that he identified himself and told the boy that he needed to speak to an adult; that he asked permission to enter; and, that the boy responded "yes" and opened the door. Officer Benfield entered the house and walked into a nearby bedroom, where he found an adult male (later identified as the co-defendant Teater) and a small boy (later identified as Robbie Methvin) in bed. Officer Benfield asked Teater to get out of the bed and arrested him. Officer Benfield testified that he did not hurry into the house, and did not feel that his life was threatened when he was outside the house. By the time Officer Benfield had arrested Teater, Officers Pease and McLean had entered the house and had arrested appellant whom they found in an adjacent bedroom. Officer McLean also testified that he did not feel that his life was in danger when he secured the outside of the house. Officer Pease testified that when he entered the home after Officer Benfield, the boy at the back door told him he could enter.
Tommy Saavedra, Jr. testified that he was 15 years old and had lived with his father for the past year and a half. On the night in question, he was awakened by the officer's knocking on the side of the house. He woke his cousin, Methvin, and together they ran into the living room and looked out the window and saw the police cars. They then ran into the bedroom and jumped into the bed with Teater who told them to lay down on both sides of him. When the police began shining their flashlight in the bedroom, Tommy Saavedra, Jr. and his cousin went to the backdoor and opened it half-way. The police immediately pushed past them without getting consent to enter. Prior to answering the door, young Saavedra did not see or have any conversation with his father. Methvin testified that he was standing behind Tommy, Jr. when he opened the back door. The police did not say anything to either of them and just pushed them aside when they entered. He knew that the police needed a warrant to enter but he was too scared to stop them.
Appellant testified that he had rented the premises at 360 Tallulah Avenue for the past year and a half; that Teater had been temporarily staying with him for the past two and a half weeks because he had no other place to live; and, that Teater never paid Saavedra any rent.
The prosecuting witness testified that at approximately 10:30 p.m., there was a power failure in the neighborhood and that she sat on her front porch with her sister. Next door she saw appellant and Teater talking to her brother, her cousin, Tommy Saavedra, Jr., and Robbie Methvin. When the power failure ended, she went next door, got her brother and her cousin, returned home and thereafter went to bed. At 2:00 a.m., she was awakened by appellant *956 who was kneeling beside her on her bed and shoving something sharp in her side. Appellant and Teater led her from her home to a nearby park. She recognized both defendants throughout the attack which took approximately one hour and 15 minutes. After the attack, she saw the defendants again in the backseat of the police car; the car light was lit, she was on her front porch, and got a clear look at their faces and identified them as her attackers.
On cross-examination, K.A. testified that she had never seen either defendant prior to that night, nor did she know their names (she had moved into her home one month earlier). She first saw them during the power failure when she was sitting inside her screened porch. When the lights went back on, she walked over to their house to get her brother and saw the defendants again for about 30 seconds. On redirect examination, she stated that during the blackout, Saavedra was shining a flashlight on the side of her house and leaning against a parked car between the houses, which are approximately 15-20 feet apart.
In support of his motion to suppress and on appeal, Saavedra argues that his arrest was illegal in that the police entered the house without a warrant, consent or exigent circumstances. Therefore, the subsequent search and seizure were unlawful. The trial court, apparently accepting the state's argument that the entry was consensual, denied the motion. The court also denied the motion to suppress the identifications, finding that the victim had seen the defendants earlier in the evening, in the light and could identify them then; that she had seen them again when she was abducted and attacked; and, that she had positively identified them in the police car. The court concluded that the identifications were not impermissibly suggestive.
The state filed a motion in limine to prohibit testimony regarding an alleged confession made by one John Baldwin (who was not charged with any crimes) to appellant's sister, Vickie Saavedra, that Baldwin, not appellant, committed the crimes. Prior to trial, the trial court granted the motion, admonishing the attorneys not to make any reference to Baldwin's statements in their opening statements.
At trial, K.A. testified that her attackers were dressed in black karate suits. They took her to some bushes in the rear of her house, tore off her clothes, pushed her to the ground and performed vaginal intercourse with her. They then took her to a slide in a park located behind her home and again performed vaginal intercourse. Teater then unsuccessfully attempted anal intercourse. The men led her to a concrete circle in the middle of the park and again performed vaginal intercourse. They told her to remain on the ground for ten minutes while they escaped. She waited three or four minutes and then ran home.
Appellant was convicted as charged and upon denial of his amended motion for a new trial, he took this appeal. In disposing of the issues raised, we shall address the substance of each.
Saavedra first argues that double jeopardy principles preclude convictions and sentences for multiple acts of sexual battery of the same type and character committed against the same victim. Otherwise stated, relying primarily on such cases as Carawan v. State, 515 So.2d 161 (Fla. 1987), Wade v. State, 368 So.2d 76 (Fla. 4th DCA 1979) and Roberson v. State, 517 So.2d 99 (Fla. 1st DCA 1987), he contends that he was convicted three times for one continuous act.
While finding no Florida case directly on point, the state nonetheless asserts that each assault occurred at a different time and location and that in between each, Saavedra had time to pause and reflect before again penetrating the victim. Thus, the state concludes, three separate offenses occurred and double jeopardy principles are not implicated. We agree with the state and hold that the criminal acts complained of in this case, although of the same type and character, are sufficiently separated by time and location so that double jeopardy is not involved.
The sexual battery statute may be violated in multiple, alternative ways, i.e., *957 "oral, anal, or vaginal penetration by, or union with, the sexual organ of another or the anal or vaginal penetration of another by any other object." § 794.011(1)(g) Fla. Stat. (1987).[2] Sexual battery of a separate character and type requiring different elements of proof warrant multiple punishments. See Duke v. State, 444 So.2d 492 (Fla. 2nd DCA) (vaginal penetration followed a moment later by anal penetration), aff'd, 456 So.2d 893 (Fla. 1984); Grunzel v. State, 484 So.2d 97 (Fla. 1st DCA 1986), (cunnilingus followed a few seconds later by vaginal intercourse); Begley v. State, 483 So.2d 70 (Fla. 4th DCA 1986) (attempted vaginal intercourse, attempted cunnilingus, fellatio, committed over two week period); Bass v. State, 380 So.2d 1181 (Fla. 5th DCA 1980) (oral sex followed by rape). However, the fact that the same victim is sexually battered in the same manner more than once in a criminal episode by the same defendant does not conclusively prohibit multiple punishments. Spatial and temporal aspects are equally as important as distinctions in character and type in determining whether multiple punishments are appropriate. See Bartee v. State, 401 So.2d 890 (Fla. 5th DCA 1981).
In Bartee, the Fifth DCA noted that "whether multiple factual events, such as repeated blows or knife stabbings, constitute separate offenses or but one offense in the aggregate, may depend on whether they are different in quality or are sufficiently separated by time or place to be different factual events and therefore separate and distinct offenses in fact." 401 So.2d at 892, fn. 4. In Bass, the court stated that "the time interval between one act, and the other was minimal, but nevertheless sufficient to separate one episode or criminal transaction from the other." 380 So.2d at 1183. In Grunzel, relying on the Second District's decision in Duke, this court stated that, "notwithstanding the short interval of time that evolved between the acts involved here, we believe each act is a separate criminal offense." 444 So.2d at 494.
Appellant's reliance on Wade v. State, supra, appears to us misplaced. In that case, the defendant was convicted of two separate violations of the sexual battery statute for a single attack on the victim. The Fourth DCA held that the attack constituted only a single violation of the statute, and vacated both convictions and remanded with instructions for the trial court to re-sentence for only one violation. However, the Wade court did not articulate the underlying facts which it relied upon in making its determination that the attack constituted only a single sexual battery. Therefore, we do not find Wade particularly helpful in analyzing the facts at hand.
Appellant's further reliance on Roberson v. State, supra, is likewise of little assistance in resolving the issue. There, this court held that it was improper to convict and sentence Roberson for sexual battery. The Roberson court distinguished Grunzel on the basis that that case involved two separate acts that violated the sexual battery statute. Since the Roberson opinion does not relate the underlying facts, we are unable to say that Roberson contains facts similar to the case under consideration.
Appellant also cites James v. Cupp, 65 Or. App. 377, 671 P.2d 750 (1983), in support of his contention in this regard. There, the defendant was convicted of two counts of rape, two counts of sodomy and one count of sexual abuse, all arising in the same transaction against the same victim. The Oregon Appeals Court reversed one rape and one sodomy conviction, stating that Oregan law precluded separate convictions and sentences for more than one count of the same act arising in the same transaction unless "the defendant, after one act, starts anew after a time for reflection," citing State v. Garcia, 288 Or. 413, 605 P.2d 671 (1980). 671 P.2d at 751. The record in James did not support a finding that the defendant paused for reflection between acts.
*958 A case which to us seems more on point with the facts of the instant case is Lillard v. State, 528 S.W.2d 207 (Tenn. Ct. App. 1975), where the defendant forcibly abducted two women, drove them to a rural spot and forced one of the women to have sexual intercourse. He then drove to another location and had sexual intercourse with the other woman. Leaving the first woman in the road, he then drove to yet another place with the second woman and again had sexual intercourse with her. He was subsequently convicted of two separate rapes of the second woman and given consecutive 20 year sentences. On appeal, he argued that he should have been sentenced concurrently for the two rapes because they constituted one crime. The Tennessee Court of Appeals upheld the consecutive sentences, finding that the acts of rape were separate in that the defendant formed a new intent to rape the woman at a different place in time. Similarly, here it can be found that Saavedra had time to pause and reflect and form a new criminal intent between acts of penetration. We so find and, therefore, hold that the acts for which appellant was convicted and sentenced constituted separate offenses. We find further that Carawan, supra, does not apply because its holding is limited to "separate punishments arising from one act, not one transaction." 515 So.2d at 170. See Slaughter v. State, 538 So.2d 509, 14 FLW 311 (Fla. 1st DCA 1989).[3] Since Saavedra committed three separate and distinct acts, multiple punishments were proper.
Appellant next complains that the warrantless entry into his home, absent exigent circumstances or consent, violated his fourth amendment rights. Payton v. New York, 445 U.S. 573, 100 S.Ct. 1371, 63 L.Ed.2d 639 (1980). He maintains that the state failed to carry its burden of showing that his son possessed the ability to consent to the entry of the officers into his home. He claims that his son merely acquiesced to the physical presence of official authority and that his subsequent illegal arrest tainted the fruits of his illegal detention. Therefore, he argues, the "tainted" evidence seized at his home and the victims "show-up" identification of him immediately after his arrest should have been suppressed since they were the product of the officers illegal entry and arrest. For its part, the state argues that under the "totality of the circumstances," the trial court properly denied appellant's motion to suppress the evidence. The state reminds us that the consentor's age is merely one of the circumstances to be examined. It argues that the officers did not take any coercive action against appellant's son when asking for permission to enter and that the 15 year old boy responded in an appropriate fashion and did not appear threatened in any way. The state finds no evidence of acquiescence to authority but rather maintains there was evidence of knowing consent to enter the dwelling. Moreover, the state asserts that the officers were motivated by the necessity to speedily apprehend the suspects and prevent destruction of evidence.
At the outset, we find that a preponderance of the evidence supports a finding that appellant's son voluntarily allowed the police to enter the premises. The narrow issue is whether a minor may consent to the entry of his father's residence by police for purposes of arresting the father and, if so, whether the consent was given freely and voluntarily. In general, the test for determining third party consent is whether that person possesses common authority over the area to be searched. United States v. Matlock, 415 U.S. 164, 94 S.Ct. 988, 39 L.Ed.2nd 242 (1974); Preston v. State, 444 So.2d 939 (Fla. 1984); Silva v. State, 344 So.2d 559 (Fla. 1977); Pinyan v. State, 523 So.2d 718 (Fla. 1st DCA 1988). Joint dominion or control provides valid consent only when the other person is absent. Pinyan, 523 So.2d at 721. "Unless consent is given by the owner or rightful possessor of the property, a warrant must be obtained. The only exception to this consent is where consent by a joint owner *959 has been obtained in the absence of the person whose property is the object of the search." Silva, 344 So.2d at 563.
In Padron v. State, 328 So.2d 216 (Fla. 4th DCA), cert. denied, 339 So.2d 1172 (Fla. 1976), the defendant denied the police permission to search his home for a murder weapon after being arrested at his home, handcuffed and placed in the back seat of a patrol car. An officer then asked defendant's 16 year old son for permission, but the boy also denied entry. When the officer ordered all persons removed from the premises, including defendant's nine year old son who was ill, the 16 year old boy acquiesced and allowed the police to enter and conduct the search. The Fourth DCA held that the 16 year old child did not share common authority with his father over their dwelling place. The court premised its holding on the notion that the parent's interest in the premises is superior to that of the child, therefore, it cannot be said that a child has authority equal to his parent to permit a search by a police of the premises. 328 So.2d at 218, fn. 1. The court additionally held that even if the son could give valid consent in his father's absence, "where the father was present and asserted his rights, the son had no authority to override that assertion." Id. at 218. The court also found that under the circumstances of that case the son's consent was not freely given.
Other jurisdictions have rejected a per se rule as set forth in Padron, and held that a consentor's age is only one factor to consider in determining the validity of this consent. See Atkins v. State, 254 Ga. 641, 331 S.E.2d 597 (1985); State v. Scott, 82 Or. App. 645, 729 P.2d 585 (1986) (expressly declining to follow Padron); Doyle v. State, 633 P.2d 306 (Alaska App. 1981). In his work, Search and Seizure: A Treatise On The Fourth Amendment, § 8.4(c) (1987), Professor LaFave states that two important factors to consider in determining valid consent by a child are the age of the child and the scope of the consent given. Consent must be given freely and voluntarily in order to be valid; such a determination is a question of fact to be gleaned from the totality of the circumstances. Schneckloth v. Bustamonte, 412 U.S. 218, 93 S.Ct. 2041, 36 L.Ed.2d 854 (1973); Preston v. State, supra at 943. Youth, lack of education and low intelligence are factors to consider in determining whether a person's will was overborn by police officers in a consent situation. Mack v. State, 298 So.2d 509 (Fla. 2d DCA 1974).
Appellant argues that his son "did not possess the level of maturity, experience, or independent will to exercise the judgment required to refuse the `aura of officialdom' surrounding the officers." Therefore, the entry and arrest were illegal under Payton v. New York. However, the record before us indicates that the son was 15 years old, five feet tall, weighed 108 pounds and was in the tenth grade. He and his father had lived at the house for the past one and a half years. He testified that, although he was tired and scared, he knew what was going on when he opened the door for the police. Officer Benfield testified that he identified himself to the boy and asked permission to enter, which was granted. There is evidence in the record that Tommy Saavedra, Jr. was aware of his right to refuse entry. In fact, he testified that he knew Officer Benfield had no right to enter the house without a warrant. Under the totality of the circumstances test, we conclude that the trial court did not abuse its discretion in finding valid consent in denying appellant's motion to suppress.
In the third issue raised, appellant maintains that the trial court erred in admitting evidence obtained after the police failed to knock and announce before entering his home, pursuant to section 901.19(1), Florida Statutes, 1987. He argues that the failure of Officer Benfield to announce the purpose of his entry makes his arrest illegal and the subsequent search conducted of the premises invalid under section 901.19(1). Urquhart v. State, 211 So.2d 79 (Fla. 2nd DCA 1968). We find this argument unavailing.
Under section 901.19(1), police may break into a residence to make a valid warrantless felony arrest only when they have *960 been denied access after announcing their authority and purpose. Failure to "knock and announce" will vitiate the lawfulness of the arrest, unless exigent circumstances are present. Benefield v. State, 160 So.2d 706 (Fla. 1964); Urquhart v. State, supra. However, section 901.19(1) is not violated when officers are voluntarily admitted. See Byrd v. State, 481 So.2d 468 (Fla. 1985); Sloan v. State, 429 So.2d 354 (Fla. 1st DCA), review denied, 438 So.2d 834 (Fla. 1983). In the instant case, the officers had lawfully entered the premises through consent of appellant's son. Therefore, the "knock and announce" statute was not activated.
Appellant next contends that the trial court abused its discretion in denying his motion for severance of defendants, pursuant to Rule 3.152(b), Florida Rules of Criminal Procedure. The defenses of appellant and his co-defendant were clearly and completely antagonistic in that the co-defendant's theory of defense was that the offenses did not occur, and appellant's defense was that the rapes were committed by co-defendant and by one John Baldwin. Where evidence directed solely against a co-defendant is prejudicial against a defendant, Saavedra maintains that severance is necessary to protect his rights and the failure to grant such severance constitutes reversible error. Suarez v. State, 95 Fla. 42, 115 So. 519 (1928); Cason v. State, 211 So.2d 604 (Fla. 2nd DCA 1968). The state responds that the trial court did not abuse its discretion in denying a motion for severance because, despite Saavedra's claim of possible antagonistic defenses, no direct evidence implicating appellant was offered by his co-defendant's theory of defense. Crofton v. State, 491 So.2d 317 (Fla. 1st DCA 1986). Additionally, the state argues, where the evidence against the defendant is overwhelming, it is not an abuse of discretion to deny a motion for severance. Id. at 319.
On this issue we conclude that the trial court did not abuse its discretion. Rule 3.152(b)(1) authorizes the trial court to order separate trials either before or during trial if the movant shows severance is appropriate to protect a speedy trial right or promote the fair determination of guilt or innocence. The trial court denied appellant's initial written motion for severance without explanation. However, during trial and before cross-examination of the complaining witness, appellant moved again for severance, which the trial court denied, relying generally on McCray v. State, 416 So.2d 804 (Fla. 1982). In that case, the defendant moved for severance of defendants on the basis of a co-defendant's inculpatory statements that the defendant shot the victim. In affirming the denial of the motion, the Florida Supreme Court stated that:
The object of the Rule [3.152(b)(1)] is not to provide defendants with an absolute right, upon request, to separate trials when they blame each other for the crime. Rather, the Rule is designed to assure a fair determination of each defendant's guilt or innocence. This fair determination may be achieved when all the relevant evidence regarding the criminal offense is presented in such a manner that the jury can distinguish the evidence relating to each defendant's acts, conduct, and statements, and can then apply the law intelligently and without confusion to determine the individual defendant's guilt or innocence. The Rule allows the trial court, in its discretion, to grant a severance when the jury could be confused or improperly influenced by evidence which applies to only one of several defendants.
416 So.2d at 806. Strategic advantage, hostility among defendants, or attempts to escape punishment by throwing blame on other defendants, are insufficient reasons, standing alone, to justify a severance of defendants. Similarly, appellant argues that Teater's defense was completely antagonistic toward his defense and that Teater theorized that the rapes did not occur and relied on a fullscale attack on the complaining witness and her testimony, while appellant asserted that Teater and John Baldwin committed the attacks. Saavedra also contends that there was substantial evidence presented against Teater which prejudiced him, i.e., that the state emphasized the fact that Teater had taken *961 a shower in the early morning hours after the crime was committed; that Teater testified that John Baldwin was in the appellant's house in the early morning hours; that appellant's son testified that he saw a man he did not know present in the house at the time of the crimes telling Teater to "hurry up"; and, that appellant's son testified that Teater "appeared to be scared" when he jumped in bed with him. Appellant also asserts that the trial court improperly limited his cross-examination of Teater regarding Teater's silence to police when he was arrested.[4] Finally, appellant contends that the style and arguments of Teater's counsel during closing argument manifested the conflicts which were apparent throughout the entire trial.
The facts here do not rise to a level warranting severance, especially when appellant was given full opportunity to confront and cross-examine the above witnesses and where competent substantial evidence implicated appellant, i.e., the victim's clear identification of appellant as one of her attackers. O'Callaghan v. State, 429 So.2d 691 (Fla. 1983). In this regard, neither Suarez nor Cason, cited by appellant in his brief, appear to be dispositive. Both cases stand for the proposition that where there is direct evidence against a co-defendant which is prejudicial against the defendant, severance is proper. In Cason, no such evidence was presented and the court denied the motion for severance. In Suarez, the court granted the motion for severance based on evidence of past similar offenses committed by one defendant and admitted only against that defendant. The court found that the evidence was prejudicial to the other defendants. In the instant case, Teater did not make any accusations implicating appellant, nor was the evidence particularly complex for the jury to distinguish each defendant's case. Therefore, we affirm the order denying the motion for severance of the defendants.
Appellant's next argument is that the trial court erred in restricting his right to present a defense to the crimes charged. Specifically, he finds fault in the trial court's granting of the state's motion in limine excluding Saavedra's sister's testimony regarding facts relevant to the alleged involvement of one John Baldwin in the sexual battery of K.A. He maintains that his sister's testimony went to the very heart of his theory of defense, namely that John Baldwin committed the crimes with which he is charged. He also urges error in the trial court's restriction of his right to cross-examine Teater on Teater's communications with the police following his arrest.
The state maintains the trial court did not abuse its discretion in granting the state's motion in limine to prevent hearsay statements made by appellant's sister. In any event, John Baldwin admitted, at trial, that he stopped by appellant's house the night of the crimes. The state finds no error in the trial court's refusal to admit the statements as statements against interest, pursuant to section 90.804(2)(c), because Baldwin was available for trial and did in fact testify. As to the appellant's inability to cross-examine Teater concerning statements allegedly made to police after his arrest, the state finds no abuse of discretion in the trial court's limiting the cross-examination in light of Teater's constitutional right against self-incrimination.
During the trial, appellant's attorney proferred Vickie Saavedra's testimony that two days after the attack she talked with Baldwin; that Baldwin admitted that he was at appellant's house on the night of the attacks sometime after 9:30 p.m.; that he did not confess to the crimes, but repeatedly stated that he did not want to go to jail, and that if "you think I did it so I did it". Appellant's attorney offered the statements as declarations against interest. The trial court sustained the state's objection to the statements until it was ascertained whether Baldwin would be present to testify. Baldwin testified at trial that he stopped by appellant's house the night of the attack at approximately 10:00 p.m., and that after appellant was arrested, Baldwin *962 remembered telling Vickie Saavedra "if ya'll think I did it, you know, call the police".
We find no error or abuse of discretion committed by the trial court in this regard. The court did not preclude appellant from presenting Baldwin's testimony. We agree with the state that further testimony by Vickie Saavedra in this respect would have been cumulative. As for appellant's assertion that he was precluded from fully cross-examining Teater, we likewise conclude that the trial court did not err. Teater denied making statements to the police when he was arrested. Thus, the trial court did not abuse its discretion in stopping appellant's attorney from further inquiry into Teater's silence to police after his arrest.
Lastly, Saavedra complains that the trial court improperly applied the Sentencing Guidelines Rule in effect at the time of the offenses. His sentencing guidelines scoresheet totaled 508 points, including 120 points assessed for three penetrations/slight victim injuries. At the sentencing hearing, appellant objected to the 100 points scored for this factor, arguing that only 40 points for one penetration should be assessed which would have the effect of reducing the recommended sentence from the 22-27 cell to the 17-22 cell. The court overruled this objection and sentenced him to five concurrent 27 year prison terms.
At the time Saavedra's offenses were committed, Florida Rule of Criminal Procedure 3.701(d)(7), provided that: "[v]ictim injury shall be scored if it is an element of any offenses at conviction." The committee notes to the rule stated that "[v]ictim injuries shall be scored for each count where victim injury is an element of each offense, whether there are one or more victims." In adopting the above rule in April, 1985, the supreme court stated in a footnote that, "[t]he committee note to Rule 3.710(d)(7) is revised to include language to clarify that victim injury is to be scored for each victim and each occurrence in excess of one where the same victim is involved. The present text of the rule has caused confusion." The Florida Bar: Amendment to Rules of Criminal Procedure (3.701, 3.988  Sentencing Guidelines), 468 So.2d 220, 221 (Fla. 1985).
On June 29, 1987, Rule 3.701(d)(7) and was amended as follows:
"Victim injury shall be scored for each victim physically injured during a criminal episode or transaction." The committee note was altered accordingly:
This provision implements the intention of the commission that points for victim injury be added for each victim injured during a criminal transaction or episode. The injury need not be an element of the crime for which the defendant is convicted, but is limited to physical trauma. However, if the victim's injury is the result of a crime for which the defendant has been acquitted, it shall not be scored.
The legislature adopted the amendment in Chapter 87-110, Laws of Florida, effective July 1, 1987. See The Florida Rules of Criminal Procedure Re Sentencing Guidelines (3.701 and 3.988), 509 So.2d 1088 (Fla. 1987). In amending the rule, the supreme court intended to have physical injury scored whether or not it was an element of the offense, and to have it scored for each victim injured during a criminal episode. 509 So.2d at 1089. The court did not expressly address whether victim injury could still be scored for each count involving the same victim, as it did in the 1985 opinion. However, by deleting such language from the rule and committee notes, it is apparent that the court and the legislature did not intend the injury to the same victim be scored more than once for a single criminal episode.
Saavedra argues that the 1985 version of Rule 3.701(d)(7), in effect at the time that the offenses were committed, should be applied only when application of the 1987 amendment would subject him to greater punishment and violation of the constitutional prohibition against ex post facto laws. Because application of the 1987 amendment would have the effect of lessening his punishment, he asserts that he is entitled to the benefit of the change in *963 the law. While we agree with him that the ex post facto clauses of the state and federal constitutions are not implicated in this case, we hold that the trial court properly applied the guideline rule in effect at the time of the offenses. As the state correctly argues in its answer brief, it is impermissible to apply the amendment of a criminal statute to offenses committed prior to the effective date of the amendment. Article X, section 9, Florida Constitution; Castle v. State, 305 So.2d 794 (Fla. 4th DCA 1974), (defendant had no right to benefit from an ameliorative change in the law) aff'd, 330 So.2d 10 (Fla. 1976).
In summary, we affirm as to each point raised on appeal and the sentences imposed on appellant.
NIMMONS, J., concurs.
BARFIELD, J., dissents with opinion.
BARFIELD, Judge, dissenting.
The officers' warrantless entry into Saavedra's home was illegal under Payton v. New York and Riddick v. New York, both reported in 445 U.S. 573, 100 S.Ct. 1371, 63 L.Ed.2d 639 (1980).
In Payton, the police, acting on probable cause, broke into Payton's home without a warrant in order to arrest him for a crime. Payton was not at home, but the police seized certain evidence which was later admitted into evidence at Payton's trial. In Riddick, the police went to Riddick's home to arrest him based on probable cause that he committed two armed robberies. When his three-year-old son opened the door, the officers observed Riddick sitting in bed covered by a sheet. The officers entered without giving Riddick an opportunity to object and arrested him. In a search incident to the arrest, the officers seized narcotics and related paraphernalia, which were later used to indict Riddick on narcotic charges. The Supreme Court of the United States held that a warrantless, nonconsensual entry into a suspect's home to make a routine, felony arrest violates the Fourth Amendment. 445 U.S. at 576, 100 S.Ct. at 1373, 63 L.Ed.2d at 644. In finding the entries in Payton and Riddick illegal, the Court stated:
The Fourth Amendment protects the individual's privacy in a variety of settings. In none is the zone of privacy more clearly defined than when bounded by the unambiguous physical dimensions of an individual's home-a zone that finds its roots in clear and specific constitutional terms: "The right of people to be secure in their ... houses ... shall not be violated." That language unequivocally establishes the proposition that "[a]t the very core [of the Fourth Amendment] stands the right of a man to retreat into his own home and there be free from unreasonable governmental intrusion." Silverman v. United States, 365 U.S. 505, 511, 5 L.Ed.2d 734, 81 S.Ct. 679, [683] 97 A.L.R.2d 1277. In terms that apply equally to seizures of property and to seizures of persons, the Fourth Amendment has drawn a firm line at the entrance to the house. Absent exigent circumstances, that threshold may not reasonably be crossed without a warrant.
445 U.S. at 589-590, 100 S.Ct. at 1381, 63 L.Ed.2d at 653.
In the instant case, the State asserts that exigent circumstances justified the officers' entry into Saavedra's home. The State suggests that the officers were motivated by the necessity to speedily apprehend the suspects and prevent the destruction of evidence. At the suppression hearing, the arresting officers testified that they did not feel that their lives were in danger when they were securing the outside of the house prior to entry; nor was there an indication that lives were being threatened or any evidence being destroyed within the house. Under the "exigency" exception to the warrant requirement, the critical inquiry is the reasonableness of the officer's belief that an emergency exists and not the actual existence of an emergency. Randolph v. State, 463 So.2d 186, 191 (Fla. 1984), cert. den., 473 U.S. 907, 105 S.Ct. 3533, 87 L.Ed.2d 656 (1985). The record in the instant case simply does not support a finding that the arresting officers believed that an emergency situation *964 existed which justified their warrantless entry into Saavedra's home.
The legality of the arrest and subsequent search, thus, turns on whether the officers entered Saavedra's home with the valid consent of Saavedra's son. In a third party consent situation, the state must show that the consentor possessed common authority or some other sufficient relationship over the area to be searched, in the absence of the nonconsenting person with whom that authority is shared. United States v. Matlock, 415 U.S. 164, 94 S.Ct. 988, 39 L.Ed.2d 242 (1974); Silva v. State, 344 So.2d 559 (Fla. 1977); Pinyan v. State, 523 So.2d 718 (Fla. 1st DCA 1988). The State must show by clear and convincing evidence that the consent was freely and voluntarily given, Bumper v. North Carolina, 391 U.S. 543, 88 S.Ct. 1788, 20 L.Ed.2d 797 (1968), which is to be determined from the totality of the circumstances. Schneckloth v. Bustamonte, 412 U.S. 218, 93 S.Ct. 2041, 36 L.Ed.2d 854 (1973); Preston v. State, 444 So.2d 939 (Fla. 1984). The majority's assertion that competent, substantial evidence was present to support the trial judge fails to address the evidentiary test to be applied.
At the onset, it is not apparent from the record that Saavedra's son shared common authority with his father over their home to permit a full-scale entry and search. See Padron v. State, 328 So.2d 216 (Fla. 4th DCA 1976), cert. den., 339 So.2d 1172 (Fla. 1976).[1] Even if Saavedra's son possessed the requisite authority to consent to entry by the police of his father's residence, I would find that such authority extended only to crossing the threshold into that portion of the home where any caller might be admitted under normal circumstances. Officer Benfield, in testimony that conflicted with that of the children, testified that he needed to speak to an adult and asked permission to enter. The police exceeded the scope of any initial, valid consent given by Saavedra's son, when they entered the other rooms of the home without any further permission from the boy or from an adult with superior authority over the premises. See State v. Wells, 539 So.2d 464, 467 (Fla. 1989), cert. granted, Florida v. Wells, 491 U.S. 903, 109 S.Ct. 3183, 105 L.Ed.2d 692 (1989) (if the police are to rely on consent to conduct a warrantless search, they are confined to the terms reasonably conferred by that consent). A young boy, awakened at 3:00 a.m. to the presence of police officers banging on the side of his home and seeking entry at the back door, does not reflect a situation where free and voluntary consent can be provided. Based on the totality of the circumstances, the arrest of Saavedra in his home was the result of a nonconsensual entry.
As a consequence of the illegal entry, I would hold that the arrest, show-up identification and physical evidence seized pursuant *965 to the written consent form were tainted and should have been suppressed. Wong Sun v. United States, 371 U.S. 471, 83 S.Ct. 407, 9 L.Ed.2d 441 (1963); Norman v. State, 379 So.2d 643 (Fla. 1980).
NOTES
[1] Like appellant, Teater was convicted as charged. On appeal to this court he advanced many of the same arguments for reversal as does appellant. His convictions and sentences were affirmed without comment.
[2] Appellant was convicted for committing a sexual battery on a person 12 years of age or older, without consent, when the victim was physically helpless to resist, in violation of section 794.011(4)(a), Florida Statutes (1987).
[3] Initially, the supreme court accepted review in Slaughter based on apparent conflict with Carawan. Later, however, the court determined that jurisdiction was granted improvidently, and dismissed the case. Slaughter v. State, 557 So.2d 34 (Fla. 1990).
[4] During appellant's cross-examination of Teater, Teater denied talking with the police when he was arrested. The court refused to allow appellant's attorney to inquire further into the reason for Teater's silence. Appellant moved for a mistrial which the trial court denied.
[1] In Padron, the defendant denied the police permission to search his home for a murder weapon after he had been arrested, handcuffed and placed him in the backseat of the patrol car. The police approached the defendant's sixteen-year-old son, who acquiesced to the officers' entry. The Fourth District Court of Appeal stated that the teenager did not share common authority with his father over their dwelling place, reasoning that a parent's interest in the premises is superior to that of his child. 328 So.2d at 218, fn. 1. The court held that, even if the teenager did share authority, he could not provide valid consent where his father was present and had already asserted his rights. 328 So.2d at 218. The court also held that, under the circumstances of the case, the son's consent was not freely or voluntarily given. Id.

Some states have rejected a per se rule that a minor does not possess sufficient authority to consent to the entry or search of his parent's residence, (or that of someone in a superior relationship), and held that age of the consentor is but one factor to consider in determining valid consent. See Atkins v. State, 254 Ga. 641, 331 S.E.2d 597 (1985); State v. Scott, 82 Or. App. 645, 729 P.2d 585 (1986) (expressly declining to follow Padron); Doyle v. State, 633 P.2d 306 (Alaska App. 1981); People v. Swansey, 62 Ill. App.3d 1015, 20 Ill.Dec. 211, 379 N.E.2d 1279 (1978); State v. Folkens, 281 N.W.2d 1 (Iowa 1979); Commonwealth v. Maxwell, 505 Pa. 152, 477 A.2d 1309, cert. den., 469 U.S. 971, 105 S.Ct. 370, 83 L.Ed.2d 306 (1984); State v. Jones, 22 Wash. App. 447, 591 P.2d 796 (1979); see also, 3 W. LaFave Search and Seizure: A Treatise on the Fourth Amendment, § 8.4(c) (1987). I agree with Professor LaFave that, under some circumstances, a child of sufficient age and maturity displaying to an officer the discretion and authority over certain areas of a home may provide valid consent to entry or search of those areas in the absence of a person with a superior authority.