[DO NOT PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT
_____

No. 13-10700
Non-Argument Calendar
_____

D.C. Docket No. 6:10-cv-00055-GKS-GJK


STEVEN GARRETT STODDARD,

Petitioner-Appellant,

versus

SECRETARY, DEPARTMENT OF CORRECTIONS,
ATTORNEY GENERAL, STATE OF FLORIDA,

Respondents-Appellees.

_____

Appeal from the United States District Court
for the Middle District of Florida
_____

(February 17, 2015)

Before ROSENBAUM, JULIE CARNES, and FAY, Circuit Judges.

PER CURIAM:

Steven Garrett Stoddard, a Florida prisoner, appeals the district court's denial of his 28 U.S.C. § 2254 petition for a writ of habeas corpus, in which he challenged his 1997 convictions for false imprisonment, sexual battery, and battery.  On appeal, Stoddard argues the following:  (1) the state trial court violated his right to be free from double jeopardy by imposing multiple punishments for the same act of sexual battery; and (2) his trial counsel rendered ineffective assistance by failing to investigate and present two witnesses—Lisa Adams and Olivia McCready—who would have supported his defense that the sex acts at issue were consensual and that the victim fabricated the sexual-battery charges.  Upon careful review of the record and the parties' briefs, we affirm the district court's denial of Stoddard's § 2254 petition.

## I.

### A.  Underlying Criminal Trial

In August 1996, Stoddard was charged by information with one count of attempted second-degree murder (Count 1);  one count of kidnaping (Count 2);  two counts of sexual battery (Counts 3 and 10);  six counts of sexual battery by use or threat of a deadly weapon (Counts 4-9);  and two counts of battery (Counts 11-12).  A jury trial was held in May 1997.

At trial, the testimony showed that Stoddard and the victim, Dawn Lahood, met in a drug treatment center in 1996 and began a consensual, dating relationship

2

thereafter.  They lived together for a short period, but Lahood ended the relationship because Stoddard had become possessive.  Stoddard then moved into his parents' house before the events giving rise to this case.

On July 31, 1996, Stoddard knocked on Lahood's door and threatened to use crack or commit suicide if she did not let him inside.  Lahood made clear that she no longer had romantic feelings for Stoddard, but she agreed to accompany him to meet an acquaintance whose car Stoddard had borrowed.

After meeting with the acquaintance and having lunch, during which Stoddard expressed his desire to get back together with Lahood, Lahood and Stoddard drove the car to Norman's, a bar in Cocoa, Florida.  They had several drinks, and Stoddard became intoxicated.  Lahood drove them to pick up the acquaintance from work, and after that, Lahood allowed Stoddard to return to her apartment until he was sober enough to go to his parents' house.  According to Lahood, nothing romantic had occurred that day.  She was angry at Stoddard, and she had not acted in a flirtatious, romantic, or sexually inviting manner towards him.

When Lahood and Stoddard arrived at Lahood's apartment, Stoddard immediately took off all of his clothes and "crawled in" Lahood's bed.  Lahood made two calls to Stoddard's sister about Stoddard.  During the second call, Stoddard grabbed the telephone and "smashed" it on the floor.  Lahood attempted

3

to leave the apartment, but Stoddard immediately grabbed the back of her shirt, pulled her back inside, locked the door, and threw her onto the sofa-bed. Following this, according to the state post-conviction court,

> Defendant gagged Lahood, put his mouth on her vagina, put his fingers into her vagina, and put his penis into her vagina. He tied her to the bed with her stockings. Lahood convinced the Defendant to let her go to the bathroom, where she locked herself in, but the Defendant kicked the door in. When the Defendant entered the bathroom, he choked her. The Defendant next pushed her onto the couch, and then penetrated her vagina with his penis and two candles. He penetrated her anus with a hair brush.

At some point between when Lahood was gagged and when she went to the bathroom, Stoddard cut the gag from her mouth with a knife. He then told Lahood "that he could just cut himself and then put [Lahood's] fingerprints on the knife and then stab [her] and kill [her] with it and then call the police and say that it was just self-defense."

Lahood further testified that, later in the evening, Stoddard wanted something to drink, and Lahood suggested that they go to a store. They left Lahood's apartment barefoot, but the store was closed, so Lahood and Stoddard went to a nearby bar instead. Lahood eventually called the police from a pay phone outside the bar. After a police officer arrived, Lahood accompanied the officer to her apartment and then to a hospital.

4

The state trial court admitted dozens of photographs taken at the hospital on July 31 showing injuries to Lahood's face, neck, shoulder, chest, breasts, back, stomach, hips, legs, and feet, including scratches, bruises, bite marks, and cigarette burns. In addition, an emergency-room doctor, who examined Lahood early in the morning following the night of July 31, testified that Lahood had injuries consistent with non-consensual intercourse, such as redness, abrasions, and slight blood around the openings of her vagina and anus. According to the doctor, Lahood also had bruises on her body that were less than 24 hours old. The prosecution introduced a videotaped interview between Stoddard and a detective following Stoddard's arrest that same night, in which Stoddard claimed that the sex was consensual and that he and Lahood had previously engaged in "kinky" or "rough" sex involving Stoddard's tying up of Lahood and insertion of objects into her vagina.

Stoddard did not testify or present any witnesses in his defense. After the state rested its case, Stoddard's trial counsel, Robert Segal, told the court that the defense had subpoenaed Olivia McCready and that both parties had some difficulty contacting her. Segal had learned the previous evening that McCready had a chemotherapy treatment earlier that morning, and, as a result, was unable to testify. He said that McCready was "a very important witness for the defense" and explained that McCready would have testified that Lahood told her that Lahood

5

had "engaged in and enjoyed rough sex."  Following a recess, Segal stated that he had been unable to secure McCready's presence.

During closing arguments, defense counsel argued that the sexual encounter between Stoddard and Lahood was consensual and that Lahood had fabricated the accusations to get rid of Stoddard and in retaliation for threatening to have her daughter kept from her, being a financial burden on her, and trying to control her.

The jury returned a verdict as follows:  Count 1 (attempted murder), not guilty;  Count 2 (kidnaping), guilty of the lesser-included offense of false imprisonment;  Counts 3 and 10 (sexual battery), guilty;  Counts 4-7 and 9 (sexual battery by use or threat of a deadly weapon), guilty of the lesser-included offense of sexual battery;  Count 8 (sexual battery by use or threat of a deadly weapon), not guilty;  and Counts 11-12 (battery), guilty.  Stoddard was sentenced to prison for a total term of 52 years, which was subsequently reduced to a total term of 25 years' imprisonment and 15 years' probation.  After sentencing, Stoddard filed a direct appeal, and the Florida Fifth District Court of Appeal affirmed without a written opinion.  *Stoddard v. State*, 711 So. 2d 560 (Fla. Dist. Ct. App. 1998).

B.  *Post-Conviction Proceedings in State Court*

Stoddard filed a motion for state post-conviction relief under Rule 3.850, Fla. R. Crim. P., which he later amended and supplemented.  He argued, among other things, that his multiple convictions for sexual battery violated double

6

jeopardy and that his trial counsel was ineffective for failing to secure or call Lisa Adams and Olivia McCready as witnesses at trial.

In support of his ineffective-assistance claims, Stoddard submitted affidavits[1] from Adams and McCready, and they both testified at an evidentiary hearing.[2]  Adams, who was working at Norman's on July 31, 1996, testified that she had seen Lahood and Stoddard, who were the only two patrons in the bar that afternoon, "hugging and kissing" and "just all over each other."  Thus, according to Stoddard, Adams's testimony contradicted Lahood's testimony about the events at Norman's and supported his position that the later sex acts were consensual.

Stoddard contended that McCready's testimony would also have supported his defense that the sex between Stoddard and Lahood was consensual and that Lahood fabricated the sexual-assault charges to exact retribution.  In her affidavit, McCready, who lived in the same apartment complex as Lahood and Stoddard, stated that Lahood had told McCready that she and Stoddard had a "very good sex life" and, on a different occasion, that she was going to "get even with" Stoddard

---

[1] Adams's and McCready's affidavits, which were executed in March and April 2000, respectively, are in the form of transcripts of interviews conducted by an investigator in October 1998.

[2] Two evidentiary hearings were held in Stoddard's Rule 3.850 proceeding.  The judge who presided over the first hearing passed away before issuing a ruling, and a second hearing was conducted *de novo* before a new judge.  Because McCready was unable to testify at the second hearing due to health problems, the parties and the new judge agreed that McCready's testimony from the first hearing could be considered in conjunction with the testimony presented at the second hearing.

for being unfaithful. At the evidentiary hearing nearly ten years later, McCready testified that she had discussed certain details with Lahood about Lahood's sex life, including that Lahood and Stoddard enjoyed "tough" or "rough" sex and that Lahood had stated that "she was going to crucify" Stoddard.

Segal also testified at the evidentiary hearing. When asked to describe his trial strategy, Segal responded as follows:

> [A]fter having spoken to all the witnesses in the case and having done the investigation, the problem that seemed to keep cropping up in my mind was that the people that we had wanted to call as witnesses, while they could potentially help us, they could also potentially hurt us.
>
> I ultimately decided, in the context of what the State was going to produce, in the context of what Ms. LaHood actually testified to at trial, that the calling of witnesses was going to be a problem, a potential problem, to the extent that there were these bad things that were going to come up and potentially hurt Mr. Stoddard, and that we would do better maintaining the two closing arguments that were available to us at the time if we didn't introduce evidence.

Segal explained that "having the first word and the last word is a valuable psychological tool" for rebutting the state's closing argument. At the time of Stoddard's trial, Florida law provided that "the defense had the right to concluding closing argument if the defendant offered no evidence at trial other than his own testimony." *In re Amendments to the Fla. Rules of Criminal Procedure–Final*

8

*Arguments*, 957 So. 2d 1164, 1166 (Fla. 2007).  This rule has since been amended.  *See id.* at 1165-67.

Segal testified that he had spoken with McCready and that he believed that the value of her testimony would not have overcome the problems with having her testify.  For instance, according to Segal, Lahood had shown McCready bruises allegedly caused by Stoddard; McCready had described Stoddard as "very cunning"; Stoddard had borrowed money from McCready that he had never repaid; McCready knew that Lahood and Stoddard both had "a lot of problems with drugs and alcohol"; and having her testify would have caused problems with closing arguments.  In addition, Segal stated, the issues about which McCready could testify were already in evidence through Lahood's testimony and the videotaped statement from Stoddard.

When asked about Adams, Segal testified,

> We went to Norman's to talk to her on one occasion and I don't believe that she was there.
>
> I don't remember whether we asked . . . the investigator at the Public Defender's office[] to go speak with her.  I don't remember whether we did or did not end up talking to her.

Segal also testified that Adams would have been a witness to Stoddard's consumption of alcohol and that Stoddard had stated that he could not remember some events from the night of July 31 because he was intoxicated.

9

According to Adams's testimony, Stoddard had sent Adams a letter asking for her help on the case, and Adams had tried to call Segal two or three times but did not hear from him. When she tried again several months later, she was able to get in touch with him or his office, but Segal never stopped by Norman's to talk with her as he said he would.

In June 2007, the state court denied Stoddard's motion for post-conviction relief. The court found that Adams was a credible witness whose testimony would have helped Stoddard's consent defense and impeached Lahood's testimony that she did not act in a romantic or flirtatious manner toward Stoddard while at Norman's. Nevertheless, the court concluded that Segal's strategic decision not to call Adams was not outside the broad range of reasonably competent performance under prevailing professional standards. With regard to McCready, the court likewise concluded that Segal's strategic decision not to have her testify was not deficient because Segal was concerned about calling her as a witness based on negative comments that she had made about Stoddard. In any case, the court concluded, Stoddard had not shown that he was prejudiced by the failure to call McCready.

The court further concluded that Stoddard had not shown a double-jeopardy violation, as Stoddard had "repeatedly sexually assaulted [Lahood] in separate, distinctive ways over hours." The court explained, "[Stoddard] proceeded from

10

one type of sexual battery to another type of sexual battery, forcing [Lahood] in a particular position that required [Stoddard] to pause, think, re-position himself and [Lahood], thus, forming a new intent on a different type of sexual battery."

The Florida Fifth District Court of Appeal affirmed the denial of Stoddard's post-conviction motion without a written opinion in November 2008. *Stoddard v. State*, 1 So. 3d 193 (Fla. Dist. Ct. App. 2008).

## C.  *Federal Habeas Proceedings under 28 U.S.C. § 2254*

Following the affirmance of the denial of his state post-conviction motion, Stoddard sought federal habeas corpus relief *pro se*, pursuant to 28 U.S.C. § 2254, in the United States District Court for the Middle District of Florida.  In January 2013, the district court denied Stoddard's § 2254 petition and denied a certificate of appealability ("COA").  The court concluded that no double-jeopardy violation occurred because Stoddard's sex acts "were serial, distinct in character, and [Stoddard] had sufficient time between each act to reflect and form a new criminal intent."  As to Stoddard's ineffective-assistance claims, the court stated that Segal (1) had "testified that he had spoken with and investigated all of these witnesses"; (2) had believed that calling them would damage Stoddard's case; and (3) had not wanted to lose first and last closing arguments by calling witnesses.  The court determined that Segal's strategic decision not to call these witnesses was

11

reasonable, and that, in any event, Stoddard had not shown prejudice in light of the evidence presented at trial.

Stoddard timely appealed, and a judge of this Court appointed counsel and granted Stoddard's request for a COA on his double-jeopardy claim and on whether trial counsel was ineffective for failing to call Adams and McCready as witnesses.

## II.

On appeal from a district court's denial of habeas relief, we review questions of law and mixed questions of law and fact *de novo*, and we review findings of fact for clear error. *Burgess v. Comm'r, Ala. Dep't of Corr.*, 723 F.3d 1308, 1315 (11th Cir. 2013). Under the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"), a federal court may not grant habeas relief on claims that previously were adjudicated in state court unless the adjudication resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established federal law, or was based on an unreasonable determination of the facts in light of the evidence presented in the state-court proceeding. 28 U.S.C. § 2254(d); *Burgess*, 723 F.3d at 1315.

A state-court decision represents an unreasonable application of clearly established federal law if the state court correctly identifies the governing legal rule from Supreme Court cases but unreasonably applies the established law to the

12

facts of the case. *Lockyer v. Andrade*, 538 U.S. 63, 75, 123 S. Ct. 1166, 1174 (2003). The Supreme Court has repeatedly emphasized that "an *unreasonable* application of federal law is different from an *incorrect* application of federal law." *Cullen v. Pinholster*, __ U.S. __, __, 131 S. Ct. 1388, 1411 (2011) (quotation marks omitted).

A state court's determination of the facts is unreasonable only if no fairminded jurist could agree with the determination. *Lee v. Comm'r, Ala. Dep't of Corr.*, 726 F.3d 1172, 1192 (11th Cir. 2013), *cert. denied*, 134 S. Ct. 1542 (2014). Findings of fact by a state court are presumed to be correct, and a habeas petitioner must rebut that presumption by clear and convincing evidence. 28 U.S.C. § 2254(e)(1); *Pope v. Sec'y for Dep't of Corr.*, 680 F.3d 1271, 1284 (11th Cir. 2012). In determining how the state courts resolved a habeas petitioner's claims, we look to the last state court that rendered a judgment in the case. *Pope*, 680 F.3d at 1284-85.

## III.

Stoddard first contends that he is entitled to relief on his double-jeopardy claim because the state post-conviction court unreasonably found facts and unreasonably applied the Supreme Court's decision in *Blockburger v. United States*, 284 U.S. 299, 52 S. Ct. 180 (1932). The evidence at trial, Stoddard contends, established at most that Stoddard committed two sexual-battery offenses

13

involving penile-vaginal penetration. These two offenses were separated by Lahood locking herself in the bathroom, which, Stoddard asserts, was the only temporal break sufficient to have allowed Stoddard a chance to pause, reflect, and form a new criminal intent. Because he was punished three times for the same offense of penile penetration after this temporal break, Stoddard argues, the state court unreasonably applied *Blockburger* in finding that the Double Jeopardy Clause did not bar his multiple punishments for these offenses.

"The Double Jeopardy Clause of the Fifth Amendment provides that no person shall be 'subject for the same offence to be twice put in jeopardy of life or limb.'" *Jones v. Thomas*, 491 U.S. 376, 380, 109 S. Ct. 2522, 2525 (1989) (quoting U.S. Const., amend. V)). In addition to protecting against multiple prosecutions for the same offense, the Clause also prohibits "multiple punishments for the same offense imposed in a single proceeding." *Id.* at 381, 109 S. Ct. at 2525 (internal quotation marks omitted).

In the context of multiple punishments, the purpose of double jeopardy is simply to "ensur[e] that the total punishment did not exceed that authorized by the legislature." *Id.* (quoting *United States v. Halper*, 490 U.S. 435, 450, 109 S. Ct. 1892, 1903 (1989)); *Missouri v. Hunter*, 459 U.S. 359, 366, 103 S. Ct. 673, 678 (1983) ("[T]he Double Jeopardy Clause does no more than prevent the sentencing

court from prescribing greater punishment than the legislature intended.").[3] Therefore, in enforcing the federal double-jeopardy guarantee, we "must examine the various offenses for which a person is being punished to determine whether, as defined by the legislature, any two or more of them are the same offense." *United States v. Dixon*, 509 U.S. 688, 745, 113 S. Ct. 2849, 2881 (1993). In effect, we ask whether the offenses are "sufficiently distinguishable to permit the imposition of cumulative punishment." *Id.* at 745, 113 S. Ct. 2881-82 (quotation marks omitted). Where no clear legislative intent has been expressed, we apply the "same-elements test" of *Blockburger*, which provides that two statutes are not the "same offense" for purposes of double jeopardy if "each provision requires proof of a fact which the other does not." *Blockburger*, 284 U.S. at 304, 52 S. Ct. at 182.

Regarding the sexual-battery offenses of which Stoddard was convicted, Counts 3, 6, 9, and 10 alleged that Stoddard placed his penis in, or in union with, the victim's vagina. It appears that Counts 6, 9, and 10 were based on actions after the bathroom incident, whereas Count 3 was based on actions before that incident.

---

[3] We disagree with the State's contention that, because the analysis is limited to a review of state law, Stoddard's double-jeopardy claim is not properly before this Court. Although state law governs the interpretation of a state criminal statute, federal law governs the evaluation of a federal double-jeopardy claim. *See Tarpley v. Dugger*, 841 F.2d 359, 364-65 (11th Cir. 1988). The fact that our review is narrow does not mean that the issue is not reviewable.

*See* Fla. Stat. § 794.011(5) (1996).[4]    Therefore, if Counts 6, 9, and 10 were based on a single criminal act, Stoddard's convictions on these counts would appear to violate the "same-elements test" of *Blockburger* and Florida law, because the offenses required proof of the same elements.    *See* Fla. Stat. § 775.021(4)(b)(1)[5]; *Blockburger*, 284 U.S. at 304, 52 S. Ct. at 182.    But Florida law provides that a defendant may be punished multiple times under the same statute so long as the offenses are each based on "distinct" criminal acts.    *See, e.g.*, *State v. Drawdy*, 136 So. 3d 1209, 1213 (Fla. 2014).

To determine whether similar criminal acts are "distinct" under Florida law for double-jeopardy purposes, courts look to spatial and temporal aspects of the criminal conduct.    *See State v. Paul*, 934 So. 2d 1167, 1172-73 (Fla. 2006),

---

[4]  Although Fla. Stat. § 794.011 does not contain a clear statement of legislative intent, the Florida legislature has instructed generally that its intent "is to convict and sentence for each criminal offense committed in the course of one criminal episode or transaction and not to allow the principle of lenity . . . to determine legislative intent."    Fla. Stat. § 775.021(4)(b); *see* Fla. Stat. § 775.021(4)(a) ("Whoever, in the course of one criminal transaction or episode, commits an act or acts which constitute one or more separate criminal offenses, upon conviction and adjudication of guilt, shall be sentenced separately for each criminal offense . . . ."). Exceptions to this rule of construction are, among other things, "[o]ffenses which require identical elements of proof." *Id.* § 775.021(4)(b)(1).

[5]  Stoddard properly concedes that his remaining sexual-battery convictions under Counts 4, 5, and 7 (for using his mouth, his fingers, and candles on Lahood's vagina) do not violate double jeopardy because they were based on distinct criminal acts.  The Florida Supreme Court has held that all of the acts proscribed by Fla. Stat. § 794.011(1)(h)—defining "sexual battery" as "oral, anal, or vaginal penetration by, or union with, the sexual organ of another or the anal or vaginal penetration of another by any other object"—are "distinct criminal acts that the Florida Legislature has decided warrant multiple punishments." *State v. Meshell*, 2 So. 3d 132, 135 (Fla. 2009).

16

*abrogated in part on other grounds by Valdes v. State*, 3 So. 3d 1067, 1075-77 (Fla. 2009); *R.J.R. v. State*, 88 So. 3d 264, 267-68 (Fla. Dist. Ct. App. 2012). For example, "courts look to whether there are multiple victims, whether the offenses occurred in multiple locations, and whether there has been a 'temporal break' between offenses." *Paul*, 934 So. 2d at 1173 (quotation marks omitted). Even multiple criminal acts of a same type and character committed against the same victim may be considered "distinct" for purposes of double jeopardy. *Saavedra v. State*, 576 So. 2d 953, 956, 958 (Fla. Dist. Ct. App. 1991) ("However, the fact that the same victim is sexually battered in the same manner more than once in a criminal episode by the same defendant does not conclusively prohibit multiple punishments."). The key question in such a case is whether "the defendant had time to pause, reflect, and form a new criminal intent between the occurrences." *See Eaddy v. State*, 789 So. 2d 1093, 1095 (Fla. Dist. Ct. App. 2001); *Saavedra*, 576 So. 2d at 958. We are bound to accept the Florida courts' construction of that State's statutes. *Hunter*, 459 U.S. at 368, 103 S. Ct. at 679.

By denying relief on Stoddard's double-jeopardy claim, the state post-conviction court implicitly determined that the evidence presented at trial was sufficient to permit the jury to conclude that three distinct penile-vaginal criminal acts occurred during the second series of events. Stoddard has not met his burden of showing that this determination involved an unreasonable application of clearly

17

established federal law, or was based on an unreasonable determination of the facts in light of the evidence presented at his trial. *See* 28 U.S.C. § 2254(d); *Burgess*, 723 F.3d at 1315.

The state court's resolution of Stoddard's double-jeopardy claim was not based on an unreasonable determination of the facts given Lahood's trial testimony. The trial transcript reflects the following exchange between the prosecuting attorney ("Q") and Lahood ("A") concerning events after the bathroom:

> Q.    Can you approximate for this jury how many times he put his penis in your vagina after the time with the incident with the knife and him talking about the knife?
>
> A.    Over and over and over and over again. I—

The prosecutor continued,

> Q.    When you said that his penis went into your vagina over and over and over, was it more than three times?
>
> A.    Yes.
>
> Q.    At various different times when he would stop, do something else and then come back and put his penis in your vagina was more than three times [sic]?
>
> A.    Yes.
>
> Q.    Okay. How did the incident all come to an end?

> A.    We—I was laying there pretending like I was asleep and he finally stopped, got up, went into the kitchen.

In sum, Lahood's testimony supports a determination that Stoddard penetrated her with his penis at least three times, and that the acts of penetration were separated by Stoddard stopping, doing something else, and then returning. Given this testimony, as well as the length of time that Stoddard and Lahood were at the apartment, it would not have been unreasonable for the state court to find that there was a temporal break between acts of penetration sufficient under Florida law for Stoddard "to pause, reflect, and form a new criminal intent between the occurrences." *Eaddy*, 789 So. 2d at 1095; *see White v. State*, 924 So. 2d 957, 959 (Fla. Dist. Ct. App. 2006) (defendant had sufficient time to form a new criminal intent where the criminal acts were separated by the victim going to and returning from the bathroom). Moreover, Stoddard's statements during his recorded interview indicate that he and Lahood had engaged in intercourse in "a couple of different positions," which also supports the state court's finding of distinct acts of penile penetration. *See Saavedra*, 576 So. 2d at 958; *see also Paul*, 934 So. 2d at 1172-73. The fact that some of Lahood's testimony—that the incident ended when Stoddard "finally stopped, got up, went into the kitchen"— could be interpreted as supporting Stoddard's contention that he was on the bed the

19

entire time does not demonstrate that a contrary finding was unreasonable. *See Lee*, 726 F.3d at 1192.

Because the state court concluded that Stoddard committed distinct criminal acts of sexual battery under Florida law during the series of events after the bathroom, and the factual determinations underlying that decision were not unreasonably found, we cannot say that the state decision was contrary to, or involved an unreasonable application of, federal law, given that the double-jeopardy guarantee "does no more than prevent the sentencing court from prescribing greater punishment than the legislature intended." *See Hunter*, 459 U.S. at 366, 103 S. Ct. 673, 678. In sum, Stoddard has not established a right to habeas relief on his double-jeopardy claim. *See* 28 U.S.C. § 2254(d); *Burgess*, 723 F.3d at 1315.

## IV.

Regarding his ineffective-assistance claims, Stoddard argues that his trial counsel, Robert Segal, was ineffective for failing to develop Adams as a witness because "she was one of the only witnesses that saw Lahood and Stoddard just hours before the alleged sexual batteries occurred." With regard to McCready, Stoddard contends, Segal was ineffective because her testimony would have showed that Lahood enjoyed rough sex and that she had a motive for fabricating rape charges. The failure to call Adams and McCready as witnesses prejudiced his

20

defense, Stoddard argues, because the jury did not hear relevant exculpatory evidence suggesting that Lahood was a willing participant.[6]

We review *de novo* a claim of ineffective assistance of counsel, which is a mixed question of law and fact. *Payne v. United States*, 566 F.3d 1276, 1277 (11th Cir. 2009). To establish ineffective assistance of counsel, the defendant must show: (1) counsel's performance was deficient; and (2) the deficient performance prejudiced his defense. *Strickland v. Washington*, 466 U.S. 668, 687, 104 S. Ct. 2052, 2064 (1984).

Counsel's performance is deficient only if it falls below the wide range of competence demanded of attorneys in criminal cases. *Id.* at 687-89, 104 S. Ct. at 2064-65. This requires a showing of "errors so serious that counsel was not functioning as the 'counsel' guaranteed the defendant by the Sixth Amendment." *Harrington v. Richter*, 562 U.S. 86, __, 131 S. Ct. 770, 787 (2011) (quotation marks omitted). When a claim implicates both AEDPA and *Strickland*'s highly deferential standards, our review is "doubly" deferential. *Id.* at __, 131 S. Ct. at 788.

---

[6] The State contends that the issue specified in the COA is not "subject to federal review under the AEDPA" because it does not reference the deferential standards of review required by AEDPA. The COA asks, "Whether the district court erred in denying Mr. Stoddard's claim that trial counsel was ineffective for failing to call witnesses Lisa Adams and Olivia McCready?" Regardless of the wording of the COA, we apply AEDPA's deferential standards of review. *See, e.g.*, *McCoy v. United States*, 266 F.3d 1245, 1248 n.2 (11th Cir. 2001) (stating that this Court "will construe the issue specification [in the COA] in light of the pleadings and other parts of the record" (quotation marks omitted)).

In evaluating counsel's effectiveness, we are guided by several considerations: (1) a strong presumption exists that counsel's performance might be considered sound trial strategy; (2) strategic choices made after a thorough investigation are virtually unchallengeable, and (3) those strategic choices made after less than complete investigation are reasonable to the extent that reasonable professional judgments support the limitations on investigation. *Strickland*, 466 U.S. at 689-91, 104 S. Ct. at 2065-66. We must not only give counsel the benefit of the doubt, but must also "affirmatively entertain the range of possible reasons [Stoddard's] counsel may have had for proceeding as he did." *Pinholster*, 131 S. Ct. at 1407 (internal quotation marks omitted).

Prejudice is a reasonable probability that, but for counsel's errors, the result of the proceeding would have been different. *Strickland*, 466 U.S. at 694, 104 S. Ct. at 2068. The likelihood of a different result must be substantial, not just conceivable. *Richter*, 562 U.S. at __, 131 S. Ct. at 792. The petitioner bears the burden of proof on both prongs of an ineffective-assistance claim. *Johnson v. Alabama*, 256 F.3d 1156, 1176 (11th Cir. 2001).

Here, the state post-conviction court found that Segal investigated Adams and other witnesses at Norman's but made a strategic decision not to call Adams because he did not want to lose first and last closing arguments and because Adams witnessed Stoddard consuming alcohol. With regard to McCready, the

22

court determined that Segal made a strategic decision not to have her testify because Segal was concerned about negative aspects of her potential testimony and because her testimony did not outweigh the value of retaining multiple closing arguments. Because the question of "whether an attorney's decision is 'strategic' or 'tactical' is a question of fact," we first review whether the state court's factual determinations were reasonable and then proceed to the legal question of the reasonableness of counsel's strategic decision. *Debruce v. Comm'r, Ala. Dep't of Corr.*, 758 F.3d 1263, 1273 (11th Cir. 2014); *see also Wood v. Allen*, 558 U.S. 290, 299-302, 130 S. Ct. 841, 848-50 (2010) (reviewing the state court's determination that defendant's counsel made a "strategic decision" not to pursue mitigation evidence as a factual determination under § 2254(d)(2)).

First, Stoddard's contention that Segal failed to adequately investigate Adams's testimony is not supported by the record. The evidence presented at Stoddard's post-conviction evidentiary hearing supported the court's finding that Segal or someone at his direction investigated potential witnesses at Norman's and that Segal was aware of the potential benefits of such testimony. *See Rhode v. Hall*, 582 F.3d 1273, 1283 (11th Cir. 2009) (counsel may hire investigators to conduct interviews of potential witnesses). In light of the record, the fact that, at the time of the evidentiary hearing in 2007, Segal did not recall speaking with Adams ten years earlier—or that Adams did not recall personally speaking with

23

Segal—does not render unreasonable the state court's determination that Segal conducted an adequate investigation of Adams's testimony. *See, e.g.*, *Chandler v. United States*, 218 F.3d 1305, 1314 n.15 (11th Cir. 2000) (*en banc*) ("An ambiguous or silent record is not sufficient to disprove the strong and continuing presumption [in favor of competence.]") While Stoddard contends that Segal should have investigated Adams's potential testimony further, neither Adams's nor Stoddard's testimony included facts regarding specific information that they had provided to Segal that purportedly should have triggered the need for further investigation. Because we "must judge the reasonableness of counsel's challenged conduct on the facts of the particular case, viewed as of the time of counsel's conduct," *Strickland*, 466 U.S. at 690, 104 S. Ct. at 2066, Stoddard has not shown that, under the facts known to Segal at the time, no reasonable attorney would have failed to further investigate Adams.

Second, the state court's factual determination that Segal made a strategic decision not to call Adams and McCready was not unreasonable. Nor has Stoddard shown that the court's determination that Segal did not have a "hard and fast rule about preserving opening and closing arguments" was unreasonable based on the evidence. At the evidentiary hearing, counsel testified that he was aware of the potential value of the testimony but believed that it did not outweigh losing the ability to do two closing arguments. Indeed, counsel described the ability to argue

24

twice as a "valuable psychological tool" for rebutting the state's closing argument.[7]

Segal explained that, after interviewing "all the witnesses in the case and having done the investigation, the problem that seemed to keep cropping up in my mind was that the people that we had wanted to call as witnesses, while they could potentially help us, they could also potentially hurt us."  For that reason, Segal believed that the better course was "maintaining the two closing arguments that were available to us at the time if we didn't introduce evidence."  Segal's testimony, which the state court credited, supports the court's finding that Segal made a case-specific, strategic decision not to present evidence in order to retain first and last closing argument. *See Cole v. State*, 700 So. 2d 33, 36 (Fla. Dist. Ct. App. 1997) (holding that a "blanket policy regarding first and last closing argument without examining the circumstances and potential defenses of each case" is *per se* deficient, but noting that a "case-specific tactical decision" may be reasonable).

Finally, given the strong presumption that counsel's decisions might be considered sound trial strategy, Stoddard has not shown that the state court unreasonably applied *Strickland* in finding that Segal's performance was not

---

[7]  While the trial transcript reflects that Segal may have intended to call McCready as a witness but was simply unable to, we cannot conclude, given her unavailability, that he would have done so if she had been present.  In addition, Stoddard states in his opening brief that "Segal knew that McCready possessed exculpatory evidence, but intentionally did not call her as a witness at trial."

deficient.  *See Richter*, 562 U.S. at __, 131 S. Ct. at 788; *Strickland*, 466 U.S. at 689-91, 104 S. Ct. at 2065-66.  While the witnesses' testimony likely would have helped Stoddard's defense, Segal was faced with the dilemma, due to Florida law applicable at the time, of deciding whether the value of the testimony was worth more than retaining a rebuttal closing argument.  *See In re Amendments to the Fla. Rules of Criminal Procedure–Final Arguments*, 957 So. 2d at 1166.  Viewing this trade-off in conjunction with "the point that '[w]hich witnesses, if any, to call, and when to call them, is the epitome of a strategic decision, and it is one that we will seldom, if ever, second guess,'" *Evans v. Sec y, Fla. Dep 't of Corr.*, 699 F.3d 1249, 1268 (11th Cir. 2012) (quoting *Waters v. Thomas*, 46 F.3d 1506, 1512 (11th Cir. 1995) (*en banc*)), we cannot say that the state court unreasonably applied *Strickland* in concluding that Segal's performance was not deficient.[8]

B.    *Prejudice*

Even assuming counsel's performance was deficient, Stoddard has not shown that the state court unreasonably determined that Stoddard did not establish prejudice.  As explained above, to meet *Strickland*'s prejudice prong, Stoddard must show that it was "reasonably likely" that, but for counsel's deficient

---

[8] Because Stoddard has not shown error in the state court's determination that counsel's performance was not deficient, he cannot establish cumulative prejudice.  *See Evans*, 699 F.3d at 1269 ("While the prejudice inquiry should be a cumulative one as to the effect of all of the failures of counsel that meet the performance deficiency requirement, only the effect of counsel's actions or inactions that do meet that deficiency requirement are considered in determining prejudice.").

performance, the result of the proceeding would have been different. *Richter*, 562 U.S. at __, 131 S. Ct. at 792. The likelihood of a different result must be substantial, not just conceivable. *Id.* Stoddard bears a heavy burden of establishing prejudice based on the failure to call witnesses "because often allegations of what a witness would have testified to are largely speculative." *Sullivan v. DeLoach*, 459 F.3d 1097, 1109 (11th Cir. 2006) (internal quotation marks omitted).

We conclude that Stoddard has failed to meet his burden of showing prejudice for several reasons. First, neither Adams nor McCready had any knowledge of what occurred at Lahood's apartment after 5:00 p.m. on July 31, 1996. Second, the physical evidence as well as the testimony from third parties was consistent with Lahood's account of events at the apartment. In particular, Lahood had numerous injuries, including bruises that were less than 24 hours old and abrasions that were, according to the emergency room doctor, consistent with non-consensual intercourse. Moreover, an officer testified that, when he came into contact with Lahood on the night of July 31, he "could tell that there had been some kind of traumatic event" because Lahood was flushed, crying, and had numerous injuries, and that, when the officer saw Lahood's apartment, he believed a "severe fight" had taken place. Third, the State represents that it was prepared to call Stoddard's sister as a rebuttal witness at trial in the event that Stoddard put on

27

witnesses. According to the State, Stoddard's sister would have corroborated that non-consensual sex occurred.

In sum, it was not unreasonable for the state court to conclude that Stoddard was not prejudiced by the absence of Adams's and McCready's testimony, whether considered separately or cumulatively. While it is conceivable that the result of the proceeding would have been different had McCready and Adams testified, Stoddard has not shown that the likelihood of a different result was "substantial." *Richter*, 562 U.S. at __, 131 S. Ct. at 792

## V.

For the reasons explained above, we affirm the denial of Stoddard's § 2254 petition.

**AFFIRMED.**

28